761 F.2d 847
 119 L.R.R.M. (BNA) 2505, 103 Lab.Cas. P 11,485,
1 Indiv.Empl.Rts.Cas. 1166
 Thomas A. GORRILL, Marion J. Wagner, Richard G. Rogers, and
E.A. Bacon, Appellees,
v.
ICELANDAIR/FLUGLEIDIR and International Air Bahama, Ltd.,
Appellants.
Wilbert S. ROGERS, Edmond G. Little, William E. McDonald,
Larry A. Swartz, Andrew H. Boer, Richard N. Brown,
and J. Richard Clarke, Appellees,
v.
FLUGLEIDIR, H.F. and International Air Bahama, Limited, Appellants.
 No. 881, Docket 84-7943.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 28, 1985.
Decided April 29, 1985.
 
 Mahlon Frankhauser, Washington, D.C. (Joanne W. Young, Charles R. Mills, Barrett Smith Schapiro Simon & Armstrong, Washington, D.C., of counsel), for appellants.
 Marvin E. Frankel, New York City (Albert G. Blakey, III, Sigmund S. Wissner-Gross, Kramer, Levin, Nessen, Kamin & Frankel, New York City, of counsel), for appellees.
 Before KAUFMAN, OAKES and MESKILL, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 Applying New York contract and corporate law, the United States District Court for the Southern District of New York, Robert L. Carter, Judge, found that International Air Bahama ("IAB"), a subsidiary of Icelandair/Flugleidir ("Icelandair"), had breached its contractual obligations in respect to appellee pilots and flight engineers, former IAB employees, by terminating them in contravention of provisions set forth in an IAB Operations Manual. The district court then pierced IAB's corporate veil, holding Icelandair responsible for the damages. On appeal, Icelandair claims that, because appellees were employees at will, their terminations do not create a cause of action, notwithstanding any breach of provisions set forth in the IAB Operations Manual; that there was no breach of the IAB Operations Manual in any event; that the corporate veils of IAB and its holding company should not have been pierced; that, in any event, the district court lacked subject matter jurisdiction under the Railway Labor Act; and, as a last resort, that damages and prejudgment interest were improperly calculated or imposed. We affirm, except as to damages for allegedly lost fringe benefits.
 
 FACTS
 
 2
 Icelandair, an Icelandic corporation, known in Iceland as Flugleidir, H.F., provides passenger and air cargo service between Iceland, the United States, and Luxembourg. IAB, a corporation under the laws of the Bahama Islands, provided passenger air service between Europe and the Bahamas, flying occasionally into New York. In 1969, Icelandair acquired IAB through a wholly owned Bahamian holding company, Hekla Holdings, Ltd.[1] As a result of the acquisition, Icelandair obtained four of the seven seats on IAB's board of directors, its chief executive officer also became chief executive officer for IAB, reporting directly to the Icelandair executive committee. In addition, Icelandair paid the salaries of IAB's director of operations and all other IAB officers and executives, Icelandair assumed all accounting, administrative, marketing and sales functions for IAB, and IAB crew members received identification cards describing them as Icelandair employees.
 
 
 3
 In 1968 and 1969, appellees became employees of IAB in connection with IAB's passenger routes; six of them served as pilots and five as flight engineers. Their service to IAB, however, was not limited to passenger service flights. In 1977, as part of a joint venture with Air India and Seaboard World Airways, Inc., Icelandair agreed to supply flight crews for Air India cargo flights from London to Bombay and other points in India, and from India to Tokyo. Thereafter, until March 1, 1983, Icelandair executed its part of the venture through IAB, which supplied Air India with flight crews whose members were IAB employees listed on the same seniority roster with IAB passenger flight crews.
 
 
 4
 On October 1, 1980, four of the appellee pilots were discharged without severance pay; on December 1, 1980, the other two appellee pilots and all of the appellee flight engineers were discharged although with severance pay. As of the date appellees were discharged, all of the retained pilots and flight engineers for both IAB's passenger operations and the Air India cargo flights had less seniority than the discharged appellees. IAB ended its passenger service on May 18, 1981, discontinued supplying crews for Air India cargo service on March 1, 1983, and, indeed, ceased doing business altogether during the pendency of this appeal and moved for dismissal as a party appellant, a motion which was granted.
 
 
 5
 Although the terms of employment of the appellees are in dispute, both parties agree that each appellee, when first hired, signed an employment agreement that covered a term of years and recited obligations to work full-time for IAB and to repay a proportionate amount of training expenses should the employee unilaterally terminate employment before the specified term. These employment agreements, however, did not set forth any of the other terms and conditions of employment. The district court found that, once on the job, appellees discussed their desire for a written employment contract with IAB's CEO and its director of operations, but on each occasion were advised that no agreement was needed, "since all the terms and conditions of employment were contained in the Operations Manual," which, they were assured, guaranteed their seniority, job security, and retirement rights. The court further found, in findings that are not seriously contested on appeal, that appellees' superiors at IAB, as well as the officials of Icelandair, conducted themselves as if the rules and regulations in the Operations Manual were binding on IAB in that changes in terms and conditions of employment obtained through negotiations were thereafter included in the Operations Manual. The Operations Manual, as revised and as in effect on the dates of appellees' discharges, provided expressly that
 
 
 6
 [s]eniority shall be the sole factor for determining demotions, transfers or termination caused by job elimination or force reduction when the senior employee is qualified to perform the available work or can be adequately trained in a reasonable or practical period of time.
 
 
 7
 IAB Operations Manual, at 1-3-21 (Jan. 1, 1979). While the Operations Manual directed that pilots be retired at age sixty, it also provided that pilots employed prior to January 1, 1977, be allowed to remain in the cockpit until age sixty-three, provided they passed first class physical examinations at four-month intervals. The retirement age for flight engineers was set at age sixty-five.[2]
 
 
 8
 Prior to appellees' discharges, IAB adhered strictly to the seniority provisions set out in the Operations Manual. At some point in time, however, Icelandair directed IAB to give preference to Icelanders and Bahamians in filling job vacancies, causing some concern to appellees, who were subsequently assured by Tedd Hope, IAB's director of operations, that IAB would "follow the policies outlined in the Operations Manual" and that Sigurdur Helgason, the CEO of Icelandair and IAB, had given Hope assurances that the jobs of all present crew members were safe. Even at trial, Helgason agreed that "the operations manual guides the company's operations," a statement in accord with his personal assurance to appellee William E. McDonald, and with his statements in several memoranda to Hope.
 
 
 9
 Nevertheless, as the district court found, sometime in 1979, because IAB and Icelandair had an excess of crews, the union representing Icelandair employees mounted pressure on Icelandair to replace non-Icelandic employees at affiliated companies with Icelandic nationals. Helgason suggested to Hope that some of IAB's American pilots be terminated by imposing a rule requiring termination of pilots at age sixty. At trial, Icelandair attempted to justify such a rule on the basis of section 2.1.7.1 of the Standards and Practices set forth by the International Civil Aviation Organization ("ICAO"),[3] which had been adopted by the Bahamas in 1977 and which provides that a contracting state, having issued a pilot's license, shall not permit the holder thereof to act as a pilot in command after his sixtieth birthday. Appellees' licenses, however, had been issued by Iceland or the United States, not by the Bahamian government. Moreover, Iceland itself had filed an exception to the ICAO Standards and Practices that would postpone retirement for pilots flying Iceland-registered aircraft until age sixty-three. Hope had known about the ICAO standards when the Operations Manual had been revised, and yet had told appellees on numerous occasions that they could fly until age sixty-three. Indeed, the Bahamian government had never issued regulations or instructions requiring IAB to adhere to the ICAO standards, and appellees Gorrill and Bacon piloted IAB passenger flights for over a year after attaining age sixty. Helgason nevertheless ordered Hope to impose the age sixty rule, and on September 30, 1980, the four appellee pilots who had attained age sixty were discharged. According to Hope's testimony, the other appellees, none of whom had reached sixty, were terminated to provide work for Icelandic nationals without affecting Bahamian personnel.[4]
 
 DISCUSSION
 
 10
 Icelandair's first argument is that, under the law of New York, because appellees were employees at will, their terminations do not create a cause of action.[5] The argument is not without plausibility, since New York has long held that employment for an indefinite term is terminable at the will of either party at any time, for any reason, or for no reason at all. See, e.g., Parker v. Borock, 5 N.Y.2d 156, 159, 156 N.E.2d 297, 298, 182 N.Y.S.2d 577, 579 (1959). Despite sharp criticism, this rule has generally maintained its vitality, although not without substantial qualification. For example, in Murphy v. American Home Products Corp., 58 N.Y.2d 293, 305, 448 N.E.2d 86, 91, 461 N.Y.S.2d 232, 237 (1983), over Judge Meyer's ringing dissent,[6] a six-member majority of the New York Court of Appeals reaffirmed the rule only after reciting its exceptions: "absent a constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment, an employer's right at any time to terminate an employment at will remains unimpaired."
 
 
 11
 In stating that the at-will discharge rule does not apply where there is "an express limitation in the individual contract of employment," the Murphy court followed its holding in Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, 443 N.E.2d 441, 457 N.Y.S.2d 193 (1982), in which it established the "express limitation" qualification to the "at-will" discharge rule. In Weiner, an employer's otherwise absolute right to discharge an employee hired for a term of indefinite duration was held, as a matter of New York contract law, to be subject to an express limitation on that right set forth only in a company personnel handbook. Rejecting the proposition that an employee's freedom to quit his employment at will is conclusive of whether, as a matter of mutuality, an employer could, in turn, terminate at will, the court found such reciprocity to be unnecessary where a promissor has received valid consideration taking the form of benefit to the promissor or detriment to the promisee. Id. at 464, 443 N.E.2d at 444, 457 N.Y.S.2d at 196. The court went on to find, on the facts before it, that a promise could be made out from the employer's representations and assurances that employees would be discharged only for "just and sufficient cause" and only after rehabilitative efforts had failed as set forth in the company handbook on personnel policies and procedures. The court further found that consideration sufficient to bind the employer to that promise could be made out from the service that the employee had begun or rendered, and from the employee's detrimental reliance on a promise that had induced him to leave a former employer. Id. at 465-67, 443 N.E.2d at 445-46, 457 N.Y.S.2d at 197-98. The court noted that the case originally adopting the at-will discharge rule, Martin v. New York Life Insurance Co., 148 N.Y. 117, 42 N.E. 416 (1895), afforded the rule "no greater status than that of a rebuttable presumption" that a trier of fact might find was overcome on a review of
 
 
 12
 the "course of conduct" of the parties, "including their writings" [citation omitted] and their antecedent negotiations. Moreover, ... it is not [an employer's] subjective intent, nor "any single act, phrase or other expression", but "the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain", which will control.
 
 
 13
 Weiner, 57 N.Y.2d at 466-67, 443 N.E.2d at 446, 457 N.Y.S.2d at 198. In Weiner, then, the highest court of New York indicated that the "express limitation" exception to the at-will discharge rule defined in Murphy, supra, is a context-sensitive exception the validity of which must be determined by a trier of fact from the actions of both employer and employee in relation to a writing that is alleged to constitute an express limitation on an employer's right of discharge.
 
 
 14
 The district court, following Weiner, considered the totality of circumstances in this case and found the Operations Manual at issue here binding on IAB, and we agree. The Operations Manual, as previously mentioned, expressly provides that seniority be the sole factor where terminations stemming from job elimination or force reduction must be made, and that employees with appellees' seniority obtain a conditional entitlement to defer retirement past the age of sixty. Given the "express limitations" on IAB's right to discharge appellees, the district court found a binding contract from the actions of the parties with respect to those provisions. As the district court stated, appellees received "repeated oral and written assurances from the employer that the Operations Manual contained the terms and conditions of employment and was controlling." In return, appellees continued to render their services to appellants, thereby satisfying the requirement of valid consideration under the limited standard established in Weiner.
 
 
 15
 Icelandair argues, however, that New York courts follow Weiner only in cases that present the four factual circumstances occurring in Weiner: (1) the employee was induced to leave his prior job with the assurance that he would not be dismissed without just cause; (2) the employee was assured in an employment application that he would not be dismissed without just cause; (3) the employee had rejected other job offers in reliance on such assurances; and (4) the personnel manual involved expressly stated that dismissal would be only for just cause and only after steps toward rehabilitation of the employee had been taken and had failed. Such an argument must fail. If Weiner stands for anything, it stands for the proposition that the merits of a claim alleging breach of an employment contract are not to be determined by application of a formula or checklist; instead, the totality of facts giving rise to the claim must be considered. Neither of the cases cited by appellants in support of its argument that Weiner should be confined to its facts, Utas v. Power Authority of New York, 96 A.D.2d 940, 466 N.Y.S.2d 390, leave to appeal denied, 61 N.Y.2d 601, 459 N.E.2d 1291, 471 N.Y.S.2d 1029 (1983), and O'Donnell v. Westchester Community Service Council, Inc., 96 A.D.2d 885, 466 N.Y.S.2d 41 (1983), contains an express statement that Weiner is to be so confined. We therefore conclude, considering the absence of such language in Murphy, supra, that those cases reflect the understandable tendency of a lower court to avoid unauthorized expansions of the Weiner exception to the at-will discharge rule. Moreover, in Tiranno v. Sears, Roebuck & Co., 99 A.D.2d 675, 472 N.Y.S.2d 49 (1984), the Fourth Department, following both Weiner, supra, and Murphy, supra, held that a triable issue of fact existed concerning whether, under the totality of circumstances, a company personnel manual required an employer to have "good cause" to terminate an employee even where the employment is of indefinite duration. Id. at 675, 472 N.Y.2d at 50.
 
 
 16
 As for Icelandair's observation that appellees were "notified in writing" of the "change in policy" destroying their seniority rights, we agree with appellees that this comes close to paltering with the court.
 
 
 17
 The district court's determination to pierce Icelandair's corporate veil is soundly based. Its findings that Icelandair dominated IAB and effectuated appellees' discharges are not seriously attacked on appeal as clearly erroneous. Nor can they be, since it was the resolution of Icelandair's board that directed IAB to give employment preferences to Icelanders and Bahamians, as well as Icelandair's CEO who directed the firing of the appellees, and Icelandair employees who effectuated appellees' discharges.
 
 
 18
 While New York is reluctant to pierce corporate veils, a parent may be held liable for the acts of its subsidiary under the principles of Lowendahl v. Baltimore & Ohio Railroad Co., 247 A.D. 144, 157, 287 N.Y.S. 62, 76, aff'd, 272 N.Y. 360, 6 N.E.2d 56 (1936):
 
 
 19
 1. Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked [emphasis added] so that the corporate entity as to this transaction had at the time [emphasis in original] no separate mind, will or existence of its own; and
 
 
 20
 2. Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and
 
 
 21
 3. The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.
 
 
 22
 The domination required by Lowendahl need not be complete as to every detail but must only be "complete ... in respect to the transaction attacked." Nor is it necessary to show that termination of employment constituted "fraud" upon appellees. Though it comes very close to that in this case it is enough under Lowendahl if it is a "fraud or wrong." Icelandair's control over IAB was used as Lowendahl states, "to perpetrate the violation of a ... positive legal duty or a dishonest or unjust act in contravention of plaintiff's legal rights." See Astrocom Electronics Inc. v. Lafayette Radio Electronics Corp., 63 A.D.2d 765, 766, 404 N.Y.S.2d 742, 744 (1978). Moreover, to suggest that the corporate status of IAB is somehow significant falls with little grace when in fact IAB was permitted to discontinue its existence while this action was pending and after the briefs were written. In sum, we find that the obligations of the erstwhile IAB must be assumed by its neglectful parent.[7]
 
 
 23
 The futility of Icelandair's arguments reaches its depths in the claim, made for the first time on appeal, that this court lacks subject matter jurisdiction. Icelandair points out that the Railway Labor Act (RLA), 45 U.S.C. Secs. 151-188 (1982), establishes an administrative arbitration procedure for the settlement of employment disputes between employees and "carriers by air." Id. Sec. 184. Icelandair argues that because this arbitration procedure is the mandatory and exclusive method for settling employee claims concerning terms and conditions of employment, including claims of wrongful discharge, see Andrews v. Louisville & Nashville Railroad Co., 406 U.S. 320, 323-26, 92 S.Ct. 1562, 1564-66, 32 L.Ed.2d 95 (1972), the district court lacks subject matter jurisdiction to entertain this case, Jackson v. Consolidated Rail Corp., 717 F.2d 1045, 1054-55 (7th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1000, 79 L.Ed.2d 233 (1984).[8]
 
 
 24
 Icelandair relies on section 1.3.7 of the Operations Manual, entitled "Personnel Procedures--Grievance Procedures," to support its claim that the Operations Manual itself contemplated exclusive administrative procedures for the settlement of employee grievances. This provision, according to Icelandair, was not made a part of the record in the district court, apparently because counsel for appellants in the district court was so confident of winning on other grounds that it saw fit not to mention the argument. While this is surely one of the lamest excuses to be made recently in an appellant's brief, we need not reject it on any doctrine of waiver, particularly since the argument is jurisdictional. We note instead that, under 45 U.S.C. Sec. 184, a board of adjustment is an agency to be created by a "carrier and ... its employees, acting through their representatives," and that IAB's employees were "not unionized" and had no "representative."[9] Moreover, as noted, IAB itself is now nonexistent for purposes of Railway Labor Act jurisdiction or otherwise.
 
 
 25
 Icelandair's remaining arguments are that the district court should not have awarded damages incurred beyond May 18, 1981, the date that IAB ceased its passenger operations; that two of the pilots were not entitled to damages after having reached sixty-three years of age; and that the court incorrectly calculated appellees' fringe benefits and prejudgment interest. The short answer to the claim for disallowing damages incurred after the cessation of IAB passenger operations is that IAB is liable in damages for its cargo as well as its passenger operations. As previously described, IAB employees made up the flight crews for Air India's cargo flights until March 1, 1983, almost two years beyond the date that IAB discontinued its passenger flights. At least three IAB crew members continued to staff Air India cargo flights after appellees were terminated, and all revenues earned by Icelandair from its Air India venture passed first through IAB. We therefore find unpersuasive Icelandair's attempt to find significance in the date IAB's passenger operations ended.
 
 
 26
 Judge Carter's award of damages through March 1, 1983, to appellees Gorrill and Bacon was based on an Operations Manual provision permitting pilots flying company aircraft of U.S. registry to work until age sixty-five. Although the aircraft used in the Air India operation were of U.S. registry, Icelandair points out that the provision of the IAB Operations Manual at issue here applied only to "company aircraft" of U.S. registry, and argues that "company aircraft" was intended to refer only to IAB aircraft. This argument is unavailing; given the nature of IAB's cargo flight operations, under any reasonable construction of the Operations Manual, the aircraft flown by IAB crews for Air India's cargo flights were "company aircraft."
 
 
 27
 On review of this case, we find troublesome only the district court's finding that appellees' fringe benefits, including health and life insurance coverage and sick pay, were worth at least 10% of their gross salary. Appellees did obtain fringe benefits, but at trial no testimony was offered one way or the other to quantify them, although the 10% computation apparently comports with a recent United States Department of Transportation study. See Financial and Cost Analysis Division, Office of Economic Analysis, Civil Aeronautics Board, Recent Trends in Airline Cost Elements--U.S. Certified Route Carriers by Group, Table 16 (Jan. 27, 1984). It is argued that appellees did not have to prove with mathematical certainty the exact value of their fringe benefits; we think, however, that there must be at least some expert testimony to support the 10% figure, and therefore reverse and remand as to this one point for purposes of taking additional testimony if appellees do not wish to waive the point.
 
 
 28
 Judge Carter's calculation of prejudgment interest running from December 15, 1981, and January 15, 1982, is from a "single reasonable intermediate date" within N.Y.Civ.Prac.Law Sec. 5001(b) (McKinney 1963). As such, and given the 9% rate then in effect, see id. Sec. 5004 (McKinney Supp. 1964-84), the court's assessment of prejudgment interest is a reasonable exercise of trial court discretion.
 
 
 29
 Judgment affirmed except as to fringe benefits, as to which it is reversed and remanded.
 
 
 
 [1]
 Because Hekla Holdings, Ltd., was not a party below and took no part in the transactions at issue here, we will refer only to Icelandair
 
 
 [2]
 The retirement provision of the IAB Operations Manual was as follows:
 (1) Retirement
 (a) Pilots will be retired upon reaching 60 years of age. Pilots employed prior to 01 Jan 1977 may continue until age 63, however they will be required to pass a First Class physical examination every four months.
 (b) Crewmembers other than pilots will be retired upon reaching 65 years of age.
 (c) Pilots operating company aircraft of U.S. registry may continue until 65 years of age.
 IAB Operations Manual at 1-3-25 (Jan. 1, 1979).
 
 
 [3]
 International Civil Aviation Organization, International Standards and Recommended Practices, Personnel Licensing, Annex 1 to the Convention on International Civil Aviation (6th ed. 1973)
 
 
 [4]
 The district court discredited the only two witnesses produced at trial by Icelandair, finding that one, a senior vice president of marketing, had no knowledge of the facts involved in the controversy and therefore could give no relevant information, and that the other, Helgason, gave evasive and often nonresponsive and untruthful answers to be rejected as lacking credibility
 
 
 [5]
 We pass over the question whether New York, Florida, Bahamian, or some other law governs, for the parties are in agreement that the law of New York is controlling, the district court treated it as such, and the case has been briefed and argued as though New York law controls. Moreover, New York law is probably more favorable to appellants than the law of any other potentially governing jurisdiction
 
 
 [6]
 Judge Meyer decried "the harshness of [the at-will discharge] rule which permits an employer to discharge with impunity a 30-year employee one day before his pension vests ... or for no other reason than that he filed a compensation claim." Id. at 307-08, 448 N.E.2d at 93-94, 461 N.Y.S.2d at 239. He described the rule to be one of "bizarre origin" that has provoked "an outpouring of judicial and scholarly writings intended to ameliorate, if not abolish, the rule," Id. at 308, 448 N.E.2d at 93-94, 461 N.Y.S.2d at 239-40 (footnote omitted)
 
 
 [7]
 Cf. N.Y.Bus.Corp.Law Sec. 1006(b) (McKinney 1963) dissolution of corporation shall not affect any remedy available against shareholders for any liability incurred by corporation before dissolution)
 
 
 [8]
 Initially, one might easily question whether either IAB or Icelandair would be proper parties for an action under the RLA. On examination, however, both would seem amenable to such an action. IAB directed its operations from New York and conducted periodic flights to and from New York; in addition, its accounting as well as its payroll disbursements emanated from New York. Icelandair directed its Western Hemisphere operations out of New York. Cf. 45 U.S.C. Sec. 151 (under RLA, "commerce" refers, inter alia, to commerce between any state and any foreign nation); id. Sec. 181 (Railway Labor Act to apply to "every common carrier by air engaged in interstate or foreign commerce")
 
 
 [9]
 We reject Icelandair's claim that appellee J. Richard Clarke, a former IAB flight engineer, became a representative within the contemplation of the RLA simply by virtue of his participation in the drafting and submission of proposals to IAB