**BAKER'S AID, A DIVISION OF M. RAUBVOGEL CO., INC., Plaintiff,**

v.

**HUSSMANN FOODSERVICE COMPANY, and Hussmann Corporation, Defendants.**

No. 87 CV 0937.

United States District Court, E.D. New York.

Feb. 13, 1990.

Fulbright Jaworski & Reavis McGrath, New York City (Joseph P. Zammit, of counsel), for plaintiff.

Gubman Sitomer Goldstein & Edlitz P.C., New York City (Michael R. Klekman, of counsel), for defendants.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

In March 1987 Baker's Aid, a division of M. Raubvogel Co., Inc. ("Baker's Aid"), moved in the New York State Supreme Court, Nassau County, for a preliminary injunction barring defendants Hussmann Corporation ("Hussmann") and Hussmann Foodservice Company ("HFC") from selling their ovens in competition with Baker's Aid

and preventing defendants from misappropriating plaintiff's technology. After defendants removed the case from state court, this Court denied plaintiff's motion for a preliminary injunction in a decision dated April 30, 1987. That decision has been affirmed by the Second Circuit. *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13 (2d Cir.1987).

Baker's Aid now moves for summary judgment pursuant to Fed.R.Civ.P. 56(a) for (i) breach of contract, (ii) breach of a covenant not to compete and (iii) conversion. Plaintiff also moves pursuant to Fed. R.Civ.P. 56(b) for summary judgment on defendants' antitrust counterclaims and defenses.

Defendants cross-move for summary judgment dismissing plaintiff's cause of action for breach of the covenant not to compete. Defendant Hussmann also moves pursuant to Fed.R.Civ.P. 56(b) for summary judgment dismissing all claims against it, asserting that it neither signed nor assumed the Manufacturing Agreement, dated June 11, 1985 (the "Manufacturing Agreement" or "Agreement"). For the reasons discussed below, plaintiff's motions are granted in part and defendants' cross-motions are denied.

### FACTS

Plaintiff is a New York corporation with its principal place of business in Syosset, New York. The verified complaint alleges that defendant Hussmann, and its wholly-owned subsidiary, defendant HFC, are Delaware corporations with their principal places of business in Bridgeton, Missouri. This Court's jurisdiction is based upon diversity of citizenship.

This case concerns the design, production and sale of rack and deck ovens to volume-feeding facilities such as supermarket chains, restaurants, prisons and hospitals throughout the United States and Canada. The rack and deck ovens in issue are large commercial ovens designed for volume baking. Rack ovens have a single heating chamber in which objects are placed on rotating racks and heated by fanned air, creating a roughly uniform temperature.

Deck ovens contain several smaller bottom-heated chambers in which objects are placed for stationary baking, and each chamber can be heated to a different temperature.

Baker's Aid is a distributor of rack and deck ovens manufactured by third parties. From 1977 until 1983, Baker's Aid purchased ovens manufactured by AB Svenska Bakugnsfabriken Fristad Sweden ("Sveba"). As a distributor, Baker's Aid re-sold these ovens under its own name throughout the United States and Canada. The relationship between Baker's Aid and Sveba dissolved in 1983 after Sveba replaced the rack and deck ovens previously sold to Baker's Aid with new models Baker's Aid found inadequate.

On June 11, 1985 Baker's Aid entered into the Manufacturing Agreement with Toastmaster, Inc., ("Toastmaster"), then a division of BIH Food Service Inc. ("BIH"). Under the Manufacturing Agreement, Toastmaster agreed to reverse engineer, or copy, the Sveba-made ovens previously purchased by Baker's Aid. This copying process was to be reduced to a series of working drawings, prints and specifications (collectively the "Specifications").

The Manufacturing Agreement also provided that the Specifications were to become the property of Baker's Aid after Baker's Aid purchased $1 million worth of Toastmaster ovens. Other significant provisions of the Manufacturing Agreement included an agreement on price and a covenant obligating Toastmaster not to compete with Baker's Aid.

After several months' engineering effort, Toastmaster first delivered ovens to Baker's Aid in August or September of 1985. These ovens did not function properly, and several months of engineering refinement were required. With the technical assistance of Baker's Aid, Toastmaster eventually developed suitable ovens.

In the fall of 1985 HFC acquired the assets of BIH, including the Toastmaster division. In July 1986 HFC acknowledged in writing that it assumed all of BIH's

**1212**

obligations under agreements entered into and guaranteed by BIH.

On October 31, 1986 Hussmann notified Baker's Aid that it intended to charge 32% more than the agreed Manufacturing Agreement price for future deliveries of rack and deck ovens. Not surprisingly, defendants' attempt to impose a price increase led to a rapid deterioration of the parties relationship.

On January 12, 1987 Baker's Aid notified defendants, in writing, that it considered the proposed price increase a breach of their contract. Baker's Aid also objected to defendants' alleged manufacture of ovens in violation of the covenant not to compete.

In a letter dated March 3, 1987, Baker's Aid notified defendants that it considered the Agreement terminated because of defendants' breach. In the same letter, Baker's Aid pointed out that it had purchased more than $1 million worth of ovens from Toastmaster and, therefore, that it was entitled to the original Specifications and all copies thereof. Shortly thereafter Baker's Aid brought the instant action.

## DISCUSSION

### I. RETENTION OF THE SPECIFICATIONS

Plaintiff asserts that defendants' retention and use of the Specifications is both a breach of contract and a tortious conversion [1] of plaintiff's property. As previously noted, the Manufacturing Agreement provides that the Specifications become the "property of Baker's Aid" upon its purchase of $1 million worth of Toastmaster ovens. Defendants agree—enigmatically— that because such purchase has occurred, Baker's Aid is "give[n] the Specifications and the right to use them." (Def.Mem. at 67).

Despite this concession, defendants contend that they are entitled to produce ovens based on the Specifications. Defendants' position is principally based on the absence of an express provision in the Manufacturing Agreement prohibiting their use of the Specifications.

### A. Breach of Contract

■ Contracts generally must be interpreted so as to effectuate the intentions of the parties. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989). If a contract is unambiguous, interpretation of such contract is a question of law. *Id.* Thus, as a threshold matter, this Court must determine whether the Manufacturing Agreement is ambiguous. *Pantone, Inc. v. Esselte Letraset, Ltd.*, 878 F.2d 601, 605 (2d Cir.1989). The Manufacturing Agreement phrase, "property of Baker's Aid", is ambiguous if such phrase:

is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Id.* at 606 (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 994 (S.D.N.Y.1968)) (applying New York law).

The critical word at issue is "property." Property is ordinarily "[t]hat which is peculiar or proper to any person; that which belongs *exclusively* to one ..." Black's Law Dictionary 1095 (5th ed. 1979) (emphasis added); 3 Bouvier's Law Dictionary 2750 (8th ed. 1914). Because the ordinary meaning of "property" implies exclusivity, the mere absence of an express provision prohibiting defendants' use of the Specifications does not render the Manufacturing Agreement ambiguous. Additionally, defendants offer no persuasive evidence of custom, usage or business practice that

---

**1.** Defendants contend that plaintiff's conversion claim cannot be considered because such claim is not properly asserted in plaintiff's complaint. Defendants, however, "misconceive[ ] the nature of federal pleading which is by statement of claim, not legal theories." *Newman v. Silver,* 713 F.2d 14, 15 n. 1 (2d Cir.1983). Plaintiff has already alleged that defendants have wrongfully appropriated the Specifications. (A–15). Because this states a claim for conversion, I reject defendants' contention.

renders ambiguous the phrase "property of Baker's Aid." Thus, I conclude that the phrase "property of Baker's Aid" is unambiguous, and that interpretation thereof is a question of law for this Court. *Hunt,* 889 F.2d at 1277.

In addition to the plain meaning of the contract, the notion that defendants retained any interest in the Specifications is contradicted by Toastmaster's further agreement to execute any documents necessary to transfer ownership of the Specifications to Baker's Aid (A.51).[2] Accordingly, I conclude that Baker's Aid acquired the exclusive right to possession and use of the Specifications upon its purchase of $1 million worth of Toastmaster ovens. It follows, of course, that defendants are not entitled to retain or use the original Specifications or any copies thereof.

### B. *Conversion*

■ Plaintiff maintains that defendants' retention and use of the Specifications also constitutes a conversion. Under New York law, conversion is defined as "any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." *Atlanta Shipping Corp. v. Chemical Bank,* 818 F.2d 240, 249 (2d Cir.1987) (quoting *Meese v. Miller,* 79 A.D.2d 237, 242, 436 N.Y.S.2d 496, 500 (4th Dep't 1981)). In this case the property allegedly converted is a copy of the Specifications. Defendants argue that because they have furnished plaintiff with a copy of the Specifications, they have discharged all their obligations and are free to keep a copy and do whatever they wish with it. (Def.Mem. at 67). Merely to state the argument demonstrates its cynicism.

In *Traveltown, Inc. v. Gerhardt Inv. Group,* 586 F.Supp. 256 (N.D.N.Y.1984), plaintiff was deprived of a copy of its blueprints, although it had another copy. The *Traveltown* court recognized this deprivation as a conversion, while limiting plaintiff's recovery to nominal damages absent

a showing that defendant used or profited from the converted blueprints. *Id.* at 258.

In the instant case HFC admits retaining a copy of the Specifications. (Def.Mem. at 67). As in *Traveltown,* this is a conversion. The extent to which defendants used or profited from the Specifications is an issue for trial.

### II. THE COVENANT NOT TO COMPETE

At the insistence of Baker's Aid, the following covenant not to compete was included in the Manufacturing Agreement:

Toastmaster, BIH Foodservice, and all Divisions of BIH Foodservice are for a period of ten (10) years subsequent to the termination of this Agreement, for any reason, specifically prohibited from soliciting, distributing, manufacturing, selling or causing to be sold to Baker's Aid customers, any rack type ovens or a deck oven based on the specifications or any reasonable facsimile thereof and further they shall not directly or indirectly sell, distribute, solicit, manufacture or cause to be manufactured rack ovens for sale or distribution in the United States or Canada.

(A–52).

Because covenants not to compete restrain trade, New York courts rigorously examine such covenants before enforcing them. *American Inst. of Chem. Eng'rs. v. Reber–Friel Co.,* 682 F.2d 382, 387 (2d Cir. 1982). Enforceability of the restrictive covenant is a threshold question that must be resolved before it can be determined whether the Agreement has been breached.

### A. *The Standard of Review*

Covenants not to compete usually arise in two different contexts: in connection with the sale of a business and as adjunct to an employer-employee relationship. Each is given a different analysis.

Defendants contend that their covenant not to compete should be viewed through the prism of an employer-employee rela-

---

**2.** The designation "(A–XX)" refers to a page in the Joint Appendix prepared on appeal from this Court's Memorandum and Order dated April 30, 1987.

tionship. Because enforcement of employee restrictive covenants may result in the loss of an individual's livelihood, such covenants are "rigorously examined" and enforced only to protect an employer from unfair competition stemming from—among other things—the disclosure of trade secrets. *American Inst. of Chem. Eng'rs v. Reber–Friel Co.*, 682 F.2d 382, 387 (2d Cir. 1982). Defendants assert that there are no trade secrets [3] in this case and, therefore, that the covenant not to compete is unenforceable, even if it is otherwise reasonable. (Def.Mem. at 31, 34).

Plaintiff, on the other hand, maintains that this case is more analogous to a sale of business. Reasonable restrictive covenants ancillary to the sale of a business are routinely enforced to protect the goodwill paid for by the purchaser. *Chevron U.S.A., Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 28 (2d Cir.1987).

It is noteworthy that this case, involving neither a transfer of goodwill nor the loss of an employee's livelihood, does not fall comfortably under the rules governing either employment agreements or the sale of a business. The fallacy of the parties arguments is that they create a false dichotomy. There is, in fact, at least a third strain of cases dealing with covenants not to compete that are made as a part of an ordinary commercial contract. These latter covenants are analyzed under a simple rule of reason.

■ When determining whether to enforce non-competition agreements not involving employment relationships or the sale of a business, courts must balance the competing public policies in favor of robust competition and freedom of contract. *Mohawk Maintenance Co. v. Kessler*, 52 N.Y.2d 276, 283, 437 N.Y.S.2d 646, 650, 419 N.E.2d 324, 328 (1981). The seminal case is *Hodge v. Sloan*, 107 N.Y. 244, 17 N.E. 335 (1887) where the New York Court of Appeals upheld an agreement by a buyer of land not to sell sand therefrom in competition with the seller. The Court of Appeals reasoned that the purchaser:

wanted to buy the land on the best terms and in the most advantageous way, and in order to do this it was necessary that he should preclude himself from so using it ... I cannot find that such a covenant contravenes any rule of public policy ... It stands upon a good consideration, and is not larger than is necessary for the protection of the covenantee in the enjoyment of his business.

*Id.* at 249–50, 17 N.E. 335.

In the instant case, as in *Hodge*, Toastmaster agreed to the covenant so that it could render profitable manufacturing services to Baker's Aid. (A–321, 747). Baker's Aid refused to enter the Manufacturing Agreement without the restrictive covenant. (A–320). Because the covenant is the result of a bargained for exchange, it should be enforced so long as it is reasonable and is no larger than necessary to protect legitimate business interests of Baker's Aid. *Hodge*, 107 N.Y. at 249, 17 N.E. 335; *see Mohawk Maintenance*, 52 N.Y.2d at 284, 437 N.Y.S.2d at 650, 419 N.E.2d at 328; Handler & Lazaroff, *Restraint of Trade and the Restatement (Second) of Contracts*, 57 N.Y.U.L.Rev. 669 (1982).

### B. *Reasonableness of the Covenant*

■ In New York, a restrictive covenant is "reasonable" if it is not excessive "as to time, scope and area and is not unduly burdensome." *Meteor Indus. v. Metalloy Indus.*, 149 A.D.2d 483, 539 N.Y.S.2d 972, 974 (2d Dep't 1989). I interpret the covenant in this case as imposing distinct ten-year restrictions prohibiting competition (i) based on the Specifications in the rack or deck oven markets, and (ii) in the United States and Canadian rack oven markets, whether or not such competition is based on the Specifications.

#### 1. Competition Based on the Specifications

Defendants contend that the restrictive covenant is unenforceable even if it is test-

---

**3.** Because my decision does not depend on the existence of trade secrets, I do not reach the issue whether the Specifications contain trade secrets.

ed under the looser "reasonableness" standard. (Def.Mem. at 33 and note). Although the basis for this position is unclear, defendants apparently assert that because the Specifications are not trade secrets, the restrictive covenant cannot serve a legitimate business purpose. (Def.Mem. at 34).

Several legitimate business interests other than protection of trade secrets do, however, exist. Such interests include prevention of unfair competition. *American Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 387 (2d Cir.1982). Under New York law, unfair competition is a malleable tort that includes any "misappropriation for commercial advantage of a benefit or property right belonging to another." *Marcraft Recreation Corp. v. Frances Devlin Co.*, 459 F.Supp. 195, 199 (S.D.N.Y. 1978).

As discussed above, the Specifications are the exclusive property of plaintiff. Therefore, plaintiff has a legitimate business interest in proscribing the unfair competition that would result from defendants' use of the Specifications.

That defendants' could develop the same Specifications after expending time, effort and money does not affect this conclusion. The Specifications paid for by plaintiff are the end product of several months' engineering effort. (A–355–56, 387–88). If defendants choose to reverse engineer another oven they are free to do so; but they may not cut short this process by converting plaintiff's property:

> [i]t is unquestionably lawful for a person to gain possession, through proper means, of his competitor's product and, through inspection and analysis, create a duplicate, unless, of course, the item is patented. But the mere fact that such lawful acquisition is available does not mean that he may, through a breach of confidence, gain the information in useable form and escape the efforts of inspection and analysis.

*Minnesota Mining & Mfg. v. Technical Tape Corp.*, 23 Misc.2d 671, 684, 192 N.Y. S.2d 102, 118 (N.Y.Sup.Ct.West.Cty.1959) (quoting *Smith v. Dravo Corp.*, 203 F.2d

369, 375 (7th Cir.1953)), *aff'd*, 15 A.D.2d 960, 226 N.Y.S.2d 1021 (2d Dep't 1962). Whether or not the Specifications purchased by plaintiff embody trade secrets, such Specifications stand:

> like a trade secret. The plaintiff has the right to keep the work which it has done, or paid for doing, to itself. The fact that others might do similar work, if they might, does not authorize them to steal the plaintiff's.

*Board of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236, 250, 25 S.Ct. 637, 639, 49 L.Ed. 1031 (1905) (Holmes, J.); *Minnesota Mining & Mfg.*, 23 Misc.2d at 684, 192 N.Y.S.2d at 118.

Accordingly, to the extent that the covenant not to compete proscribes competition based on the Specifications, it is reasonable and enforceable. The record is barren of any evidence that the defendants have an independent source of oven technology. The conclusion is irresistable that defendants' competition is based solely on the Specifications. Therefore, plaintiff's motion for summary judgment is granted insofar as it relates to HFC's use of the Specifications.

### 2. Competition in the United States and Canada

The covenant not to compete also provides that, even if they do not use the Specifications, Toastmaster, BIH and all divisions of BIH shall not, for a period of ten years, "directly or indirectly sell, distribute, solicit, manufacture or cause to be manufactured rack ovens for sale or distribution in the United States or Canada." (A–52). Plaintiff maintains that this covenant is reasonably necessary to prevent disclosure of proprietary information and to insure that the Manufacturing Agreement does not become "an unintended vehicle to create, fund and educate a competitor." (A–1149–50). I disagree.

The limited know-how and proprietary information imparted to defendants, if any, is adequately protected by the proscription of competition based on the Specifications. Without the Specifications, the Manufacturing Agreement does not provide defendants any significant vehicle for entering

the rack oven market. To the contrary, the record indicates that defendants could have entered the rack oven market at any time, provided that they invested enough time and money to reverse engineer an existing rack oven.

Although plaintiff has had ample opportunity to do so, it has failed to show that banning defendants from the United States and Canadian rack oven markets is a narrowly tailored restraint necessary to protect a legitimate business interest of plaintiff. Therefore, after a review of the entire record, I conclude that this portion of the covenant is overbroad.

Where a restrictive covenant contains both reasonable and overbroad provisions, this Court may "make use of the tool of severance, paring an unreasonable restraint down to appropriate size and enforcing it." *Karpinski v. Ingrasci*, 28 N.Y.2d 45, 52, 320 N.Y.S.2d 1, 7, 268 N.E.2d 751, 757 (1971); *Meteor Indus. v. Metalloy Indus.*, 149 A.D.2d 483, 539 N.Y.S.2d 972, 974 (2d Dep't 1989). Accordingly, the proscription of competition in the rack oven markets of the United States and Canada is severed. The covenant, as reformed, is enforceable.

### III. DEFENDANTS' ANTITRUST COUNTERCLAIMS AND DEFENSES

Defendants allege that the covenant not to compete violates Sherman Act sections 1 and 2 and New York's Donnelly Act.[4] Plaintiff asserts that it is entitled to summary judgment as to each antitrust allegation.

### A. *Sherman Act Section 1 and New York's Donnelly Act*

■ Preliminarily, I reject defendants' contention that the covenant not to compete constitutes a *per se* violation of the Sherman Act. The *per se* rule is applied to arrangements which "because of their pernicious effect on competition and lack of

any redeeming virtue are conclusively presumed to be unreasonable ..." *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *see White Motor Co. v. United States*, 372 U.S. 253, 262, 83 S.Ct. 696, 701, 9 L.Ed.2d 738 (1963).

In *Bradford v. New York Times Co.*, 501 F.2d 51 (2d Cir.1974), the Second Circuit refused to apply the *per se* rule to an employee covenant not to compete. *Id.* at 60. The *Bradford* court reasoned that because employee restrictive covenants are typically analyzed under state law, federal courts have not had the considerable experience necessary to classify such covenants as *per se* violations of the Sherman Act. *Id.* at 60.

As with the employee restraint in *Bradford*, covenants not to compete ancillary to an otherwise legitimate contract are typically analyzed under state law. *See, e.g., Hodge v. Sloan*, 107 N.Y. 244, 249–50, 17 N.E. 335 (1887). As a result, federal courts have not had sufficient experience with such covenants to conclude that they are so pernicious as to lack any redeeming value. I conclude, therefore, that the restraint in issue should be analyzed under the rule of reason. *See Carvel Corp. v. Eisenberg*, 692 F.Supp. 182, 185 (S.D.N.Y.1988) (restrictive covenants are analyzed under the rule of reason).

The rule of reason requires the factfinder to weigh "all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). Whether a particular restraint is unreasonable must be determined "in light of its common law antecedents." *Bradford*, 501 F.2d at 59; *see Business Elec. v. Sharp Elec.*, 485 U.S. 717, 108 S.Ct. 1515, 1524, 99 L.Ed.2d 808 (1988).

---

**4.** Defendants also allege that plaintiff violated section 3 of the Clayton Act and section 5 of the FTC Act. Defendants now concede the unavailability of relief under both these sections. Ac-

cordingly, I dismiss defendants' antitrust claims relating to either section 3 of the Clayton Act or section 5 of the FTC Act.

I have already discussed at length the reasonableness of the proscription of competition based on plaintiff's Specifications. The broader ban on competition in the rack oven market is more problematical.

As as matter of state common law, I have severed that portion of the restrictive covenant that is broader than necessary to protect plaintiff's legitimate business interests. As reformed, the covenant does not violate the New York common law policy against restraint of trade; it is an enforceable restraint ancillary to the Manufacturing Agreement.

■ Similarly, under the Sherman Act a court may enforce the reasonable portion of a restrictive covenant that is overbroad, so long as the covenant is drafted in good faith as a restraint ancillary to a legitimate business transaction. *See Lektro–Vend Corp. v. Vendo Co.*, 660 F.2d 255, 267 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *Alders v. AFA Corp. of Florida*, 353 F.Supp. 654, 658 (S.D.Fla.1973), *aff'd without opinion*, 490 F.2d 990 (5th Cir.1974). Clearly, the instant restraint is ancillary to legitimate business purposes of the Manufacturing Agreement.

Good faith in drafting is suggested by the arm's length negotiations of the covenant and the fact that the covenant is geographically limited to the marketing area of Baker's Aid. *Alders*, 353 F.Supp. at 659. It is also significant that Baker's Aid acknowledges it is entitled to enforcement of the covenant only to the extent the covenant is reasonable. *See Lektro–Vend*, 660 F.2d at 267. Moreover, enforcement of the reasonable restraint embodied in the covenant not to compete is consistent with the state common law antecedents of severance and reformation.

■ I conclude that the covenant not to compete, as reformed by this Court, is a reasonable restraint that is permissible under the Sherman Act. Accordingly, defendants' section 1 counterclaim is dismissed.

Defendants also counterclaim pursuant to New York's Donnelly Act, N.Y.Gen. Bus.Law § 340 (McKinney 1988). The Donnelly Act is "modeled after the Sherman Act ..." *Venture Technology Inc. v. National Fuel Gas Co.*, 685 F.2d 41, 42 n. 1 (2d Cir.), *cert. denied*, 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982). Like the Sherman Act, the Donnelly Act proscribes only unreasonable restraints of trade. *Business Foods Serv., Inc. v. Food Concepts Corp.*, 533 F.Supp. 992, 996 (E.D.N.Y. 1982). In the instant case, analysis under the Donnelly Act and the Sherman Act is congruent. *Venture Technology*, 685 F.2d at 42 n. 1; *H.L. Hayden Co. v. Siemens Medical Sys.*, 672 F.Supp. 724, 745 (S.D.N.Y.1987), *aff'd*, 879 F.2d 1005 (2d Cir.1989); *Hsing Chow v. The Union Cent. Life Ins. Co.*, 457 F.Supp. 1303, 1308 (E.D.N.Y.1978). Accordingly, the reasoning which requires dismissal of defendants' section 1 counterclaim equally requires dismissal of defendants' Donnelly Act counterclaim. *See Hsing Chow*, 457 F.Supp. at 1308.

### B. *Sherman Act Section 2*

Defendants' third counterclaim is that plaintiff attempted to monopolize the rack oven market in violation of section 2 of the Sherman Act. The three elements of an attempt to monopolize are: "(1) anticompetitive or exclusionary conduct; (2) a specific intent to monopolize; and (3) a 'dangerous probability' that the attempt will succeed." *Kelco Disposal v. Browning–Ferris Indus.*, 845 F.2d 404, 407 (2d Cir.1988), *aff'd*, ── U.S. ──, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (citations omitted). Because I conclude defendants cannot demonstrate a "dangerous probability" of monopolization, I need not consider whether defendants have demonstrated anticompetitive conduct or an intent to monopolize.

■ A dangerous probability of monopolization exists when anticompetitive conduct is undertaken by a party enjoying monopoly power. *International Distrib. Center, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 791 (2d Cir.1987). In determining whether monopoly power exists, market share is properly treated as "strong, perhaps presumptive, evidence of the presence or absence of market power, subject to bolstering or rebuttal by other evidence."

*Broadway Delivery Corp. v. United Parcel Serv.*, 651 F.2d 122, 128–29 (2d Cir.), cert. denied, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384.

A trial judge may conclude that a particular record "permits no reasonable inference other than that defendant lacks monopoly power ... if the defendant's share is less than 50%, or even somewhat above that figure, *and* the record contains no significant evidence concerning the market structure to show that defendant's share of that market gives it monopoly power." *Id.* at 129 (emphasis in original). In a recent attempted monopolization case, *United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737 (2d Cir.1989), the Second Circuit held that a market share of 31% was "below the threshold market share necessary for the antitrust violations asserted." *Id.* at 742; *see, e.g., United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir.1945) (33% of relevant market not a monopoly).

■ According to defendants' expert, Baker's Aid has a market share between 29 and 33 percent in a relevant market defined as "the sale of rack ovens to supermarket bakeries." (Def. Mem. at 46). I am not persuaded that defendants' definition of the relevant market is correct. The relevant market is properly defined only if "it includes all reasonable substitutes for the product." *Jefferson Parrish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 37–38, n. 7, 104 S.Ct. 1551, 1571–72 n. 7, 80 L.Ed.2d 2 (1984) (O'Connor, J., concurring). In the instant case, whether other ovens are reasonable substitutes for rack ovens is a matter of dispute. Nonetheless, for purposes of the instant motions, I assume defendants' definition of the relevant market is correct.

The mean of the market share range suggested by defendants is 31%. As in *United Airlines*, I conclude that a market share of 31% is below the "threshold market share necessary" to establish a claim of attempted monopolization. *United Air Lines, Inc.*, 867 F.2d at 743.

This threshold conclusion is supported by the other relevant evidence contained in the record. Excluding market share, factors which may be considered when determining whether an entity has monopoly power include "the strength of the competition, the probable development of the industry, barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand." *International Distrib. Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 792 (2d Cir.1987).

This Court has previously determined that Baker's Aid faces strong competition. (A–661). The nature of the alleged anticompetitive conduct—enforcement of a covenant not to compete ancillary to a legitimate business transaction—does not suggest that Baker's Aid will monopolize the rack oven market.

Plaintiff's expert testified that there are no significant barriers to entering the rack oven market. (A–100, 101). This testimony is not contradicted by defendants' expert or any other evidence in the record.

Finally, defendants assert that monopoly power is shown by plaintiff's ability to sell virtually the same ovens as HFC at a higher price. (Def. Mem. at 51, 60). Evidence that an entity is able to earn above normal profits may be an indication that such entity has market power. *Borden Inc. v. FTC*, 674 F.2d 498, 511–12 (6th Cir.1982), *vacated on other grounds*, 461 U.S. 940, 103 S.Ct. 2115, 77 L.Ed.2d 1298 (1983); ABA Antitrust Section, *Antitrust Law Developments*, 120 (2d ed. 1984). The mere fact that Baker's Aid is able to sell its ovens at a higher price than HFC is not, however, evidence that Baker's Aid earns above normal profits.

To the contrary, any suggestion that Baker's Aid earns above normal profits through super-competitive pricing is contradicted by the price survey prepared for defendants by their experts, the Weller Company. This survey shows that nine Baker's Aid competitors sell rack ovens at list prices ranging from $10,000 to $35,160, and that Baker's Aid sells its rack ovens for a list price of $23,758. This mid-range pricing is inconsistent with defendants' allegations of super-competitive pricing.

Thus, a review of the entire record reveals no evidence tending to rebut the lack of monopoly power suggested by plaintiff's 31% market share. Accordingly, I conclude that the record permits no reasonable inference other than that Baker's Aid lacks monopoly power. Because monopoly power is necessary to establish a dangerous probability that an attempted monopolization will succeed, defendants' section 2 counterclaim must be dismissed.

## IV. DEFENDANTS' OTHER DEFENSES

Finally, defendants interpose a congeries of miscellaneous defenses. Specifically, defendants assert that (i) the Manufacturing Agreement is void for lack of mutuality and considerations, (ii) defendants lack privity under the Manufacturing Agreement and did not assume any obligations thereunder, and (iii) plaintiff is not the real party in interest.

### A. Mutuality and Consideration

█ It is hornbook law that a contract which does not require performance by each party is unenforceable for lack of consideration. *Joneil Fifth Ave., Ltd. v. Ebeling & Reuss Co.*, 458 F.Supp. 1197, 1200 (S.D.N.Y.1978) (applying New York law). Defendants contend that the Manufacturing Agreement is unenforceable due to lack of mutuality and consideration because it does not expressly require Baker's Aid to purchase any ovens. This contention is not well taken.

█ Baker's Aid was obligated to purchase and pay for ovens under the Manufacturing Agreement, "even if the agreement did not expressly say so." *See Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 574 n. 8 (2d Cir.1969). "A promise may be lacking, and yet the whole writing may be 'instinct with an obligation' imperfectly expressed." *Wood v. Lucy, Lady Duff Gordon*, 222 N.Y. 88, 91, 118 N.E. 214 (1917) (Cardozo, J.); *Perma Research*, 410 F.2d at 572 n. 8. In such a case, a good faith agreement to purchase one's requirements is properly implied.

The Manufacturing Agreement contains detailed provisions concerning termination, price and design standards, and is clearly "instinct with an obligation." Indeed, defendants admit Baker's Aid has purchased more than $1 million worth of ovens under the Manufacturing Agreement. Because the Manufacturing Agreement impliedly obligated Baker's Aid to make such purchases, I reject the suggestion that the Manufacturing Agreement is unenforceable due to a lack of mutuality or consideration.

### B. Lack of Privity

The Manufacturing Agreement was originally entered into by Baker's Aid, Inc., Toastmaster and BIH, as guarantor of the obligations of Toastmaster. Defendants maintain that their lack of privity under the Manufacturing Agreement shields them from liability because they never validly assumed any Manufacturing Agreement obligations.

I reject this argument out of hand as to defendant HFC, which clearly assumed the obligations of BIH in a letter to Baker's Aid dated July 21, 1986. (A–771). The contentions that the Manufacturing Agreement is not a "legal contract" assumed by the letter, and that HFC did not "enter into" the Manufacturing Agreement, are frivolous.

█ It is not clear, however, that Hussmann is jointly liable under the Manufacturing Agreement. A parent corporation is generally not liable for the contracts of its subsidiary unless the parent dominates the subsidiary to such a degree that the subsidiary is a "mere instrumentality" of the parent with no will of its own. *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988); *Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 853 (2d Cir.1985). There is a presumption of separateness between parent and subsidiary "which is entitled to substantial weight." *American Protein*, 844 F.2d at 60.

Nonetheless, if Hussmann used its control of HFC to obtain the Specifications for use in competition with Baker's Aid, Huss-

mann violated the rights of Baker's Aid under the Manufacturing Agreement. Such use of control in violation of legal rights is precisely the type of conduct which justifies a "piercing of the corporate veil", which would in turn leave Hussmann liable for breach of the Manufacturing Agreement. *See Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 853 (2d Cir. 1985).

I cannot, however, determine the degree of control Hussmann has exerted over HFC. Whether a parent's domination of its subsidiary is so complete that the legal fiction of corporate separateness is to be ignored is normally a question for the jury. *American Protein*, 844 F.2d at 60. Therefore, whether Hussmann is jointly liable for HFC's breach of the Agreement is a question properly reserved for trial.

## C. *Real Party in Interest*

The Manufacturing Agreement was executed in the name of "Baker's Aid, Inc.," a currently inactive corporation with no assets. This case is brought in the name of "Baker's Aid, a division of M. Raubvogel Co., Inc." Defendants contend that the instant dispute cannot be resolved because the case is brought in the name of "Baker's Aid, a division of M. Raubvogel Co., Inc.," rather than in the name of "Baker's Aid, Inc.", the actual signatory to the Manufacturing Agreement.

In a prior proceeding in this case, the Second Circuit has observed that "[a] division of a corporation is not a legal entity with capacity to bring suit ..." *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 14 n. 1 (2d Cir.1987). While defendants are quick to point out this observation, they fail to note that the Second Circuit also observed that this deficiency is unlikely to be dispositive. *Id.*

In a similar case cited by defendants, *Larido Corp. v. Crusader Mfg. Co.*, 4 Misc.2d 231, 155 N.Y.S.2d 715 (Sup.Ct.N.Y. Cty.1956), defendant claimed it was not bound by the contract in issue because the contract improperly designated defendant as "Crusader Manufacturing Corp." rather than "Crusader Manufacturing Company".

4 Misc.2d at 234, 155 N.Y.S.2d at 719. The court rejected defendant's claim as meritless because the parties performed the contract as if it were one between plaintiff and defendant. 4 Misc.2d at 234, 155 N.Y.S.2d at 719.

As in *Larido*, the parties treated the Manufacturing Agreement as a contract involving "Baker's Aid, a division of M. Raubvogel Co., Inc." (A–748, 768, 772, 782). Therefore, M. Raubvogel Co., Inc. is clearly the real party in interest under the Manufacturing Agreement. *See Larido*, 4 Misc.2d at 234, 155 N.Y.S.2d at 719.

The caption in the instant case lists as plaintiff "Baker's Aid, a division of M. Ravbvogel Co., Inc." Because the current caption already names the real party in interest, M. Raubvogel Co., Inc., mention of Baker's Aid is merely surplusage. *American Jerex Co. v. Universal Aluminum Extrusions, Inc.*, 340 F.Supp. 524, 528 (E.D.N.Y.1972). Defendants' motion to dismiss on the grounds of such surplusage must be denied. *Id.*

## CONCLUSION

In summary, I find that defendant HFC's retention of the Specifications is a conversion and a breach of contract for which plaintiff is entitled to summary judgment. Further, I conclude that the Manufacturing Agreement covenant not to compete is enforceable to the extent it proscribes competition based on the Specifications. I also find that HFC's admitted competition is based on the Specifications. Therefore, I conclude that plaintiff is entitled to summary judgment for HFC's breach of the covenant not to compete.

I reserve for trial the issue of whether Hussmann controlled its subsidiary, HFC, to such an extent that it is jointly liable for HFC's breach and conversion. Accordingly, I deny both plaintiff's motion for summary judgment against Hussmann and Hussmann's motion to dismiss the claims against it.

Finally, I dismiss defendants' antitrust counterclaims and defenses. I also dismiss defendants' defenses based on mutuality,

real party in interest and, as to defendant HFC, privity.

SO ORDERED.