OPINION OF THE COURT
Edward J. Greenfield, J.
This is an action for wrongful discharge, but unlike many such cases which have besieged the courts of late, this one involves an executive employee who in fact had a carefully worked out written contract, and now, claiming a breach, insists on a literal application of that contract.
In 1982 Milton Petrie, chairman of the board of the Petrie Stores Corporation, was 79 years old. He had founded the company in 1927, and had built it up into a chain of 1,400 women’s specialty stores (operating under a variety of names) in 45 States, Puerto Rico, the Virgin Islands, and the District of Columbia. For the fiscal year ended January 31, 1982 the corporation had net sales of over $529 million and earnings before taxes of over $86 million. The company’s stock was listed on the New York Stock Exchange, but Milton Petrie owned 63.2% of the common stock. At this stage, Mr. Petrie decided that possibly it was time for him to take a less active role, and put a younger man in charge of the company’s day-to-day affairs, as the "heir apparent”. A number of possibilities were considered before Mr. Petrie decided to sound out Michael J. Boyle.
Michael J. Boyle was approached about the possibility of running the Petrie stores. He was 38 years old, and was then chairman of the board of the F. & R. Lazarus Stores headquartered in Columbus, Ohio. Lazarus was a division of Federated Department Stores of which Boyle was executive vice-president. Boyle had worked at Bambergers from 1964 to 1973 and worked in retailing for the Melville Corporation until 1976, when he had joined Federated. As of May 1982, Boyle had operating and merchandising responsibilities for 18 retail department stores with 10,000 employees. He was then earning $350,000 annually.
*383 In the spring of 1982, Mr. Petrie telephoned Mr. Boyle and asked to meet with him in New York City. They met on May 26, 1982. Petrie testified he "took a shine to him” and decided to hire him. Petrie told Boyle that he would like him to take over the running of the Petrie Stores.
Mr. Boyle had admired the techniques and business skill of Mr. Petrie, who he acknowledged "was a legend in his field”. The financial adviser of Mr. Petrie, and a partner of Sullivan & Cromwell well-versed in executive compensation agreements, met with Boyle. Boyle wanted to know why he should leave his current position and make a change, particularly since he had been informed that Mr. Petrie was a difficult man to deal with and could summarily dismiss an employee, not unlike George Steinbrenner of the New York Yankees who insisted on running the show his own way.
Boyle thereafter was presented with a draft of a proposed employment agreement which had been drawn up by Sullivan & Cromwell. Boyle then retained the firm of Shearman & Sterling to represent him in connection with the contract. The employment agreement went through additional drafts, and on September 17, 1982 it was presented to the board of directors of Petrie Stores. Under the contract, Boyle was to become president and chief executive officer of the corporation as of November 1, 1982 and was to be awarded 50,000 shares of common stock then held in the corporate treasury, with options to purchase additional shares. The contract contained explicit provisions as to the grounds for and the consequences of termination of the contract, which will be referred to hereafter. The board approved the agreement, which was duly executed, and amended the corporate bylaws to reflect the fact that Milton Petrie, the chairman of the board, was to preside at director’s meetings, but that he was no longer to be the chief executive officer. Boyle, as chief executive officer and president, was, subject to the control of the board, to "have general supervision over the business of the corporation”.
The contract was for a term of five years, and Mr. Boyle was to be compensated at the rate of $400,000 for the first three years, $425,000 for the fourth year, and $450,000 for the fifth. In addition, he was to receive performance bonuses of at least $50,000 for each full year. In addition to the 50,000 shares of stock to be awarded as of November 1, 1982, he was given an option to purchase an additional 250,000 shares at a fixed price. He was also to be given all expenses and disbursements *384 reasonably incurred in the performance of his duties, travel and moving expenses, temporary living expenses, counsel fees, a sum of up to $100,000 in lieu of benefits he would forfeit with his previous employer, and a loan of $750,000 (later increased to $875,000) at 10% interest for the acquisition of living quarters.
The other executives at Petrie Stores assumed that Boyle would operate under Mr. Petrie’s tutelage. Petrie considered that he was still in charge of the business and had not relinquished his authority, and he intended to have Boyle subordinate to him. The problem was that Boyle and Petrie each construed the contract and the lines of authority differently, a fact which ultimately gave rise to this lawsuit and leaves to this court the responsibility of determining their respective responsibilities after the events played themselves out.
Boyle in fact reported for work at the corporate headquarters in Secaucus on November 8, 1982. While Boyle informed the other Petrie executives that he was now the chief executive officer, and they should take their directions from him, Petrie continued to give operating directions just as he always had. Boyle observed his operations, treating the initial period as an orientation and training period. At the beginning of January 1983, Boyle decided to assert himself as the chief, in fact as well as in name. He called a meeting of those in the company concerned with real estate and told them that he, and not Petrie, was to be consulted about all real estate decisions, that he was the boss, and that he could reprimand Petrie for getting involved in real estate decisions. The other employees were shocked and confused. He then proceeded to Petrie’s office and dictated a memo to his secretary inquiring when Petrie would be moving out. The next day Boyle testified that Petrie told him that he would not be moving right away. Petrie testified that he told Boyle "It wasn’t any of his Goddamn business!”
On January 6, a formal real estate meeting and review, with Petrie present, was held. As various items were taken up, Petrie said, "Leave it to me, I’ll take care of it.” When Boyle pressed him for details, Petrie repeated, "I’ll take care of it”. At the conclusion of the meeting Petrie confronted Boyle in his office. With mounting anger, he said, "Where the hell do you get off to question my authority on these leases and embarrass me in front of all my organization?” He told Boyle he was moving in too fast. Boyle challenged him, and *385 impertinently replied, "If you didn’t have 63 percent of this stock, I would take you to the Board of Directors and have you removed as Chairman.” This was too much for Petrie. He exploded, "You’re fired!
A special meeting of the board of directors was held on January 13, 1983. Boyle was told to wait outside. Mr. Petrie presided at the meeting and told the board that Boyle had been insubordinate, demoralizing and rude. He also complained about Boyle making cars available to employees and giving raises, and that three-year contracts had been given to Boyle’s proteges, without Petrie’s approval. The board did not discuss the terms of Boyle’s employment agreement or ask to hear Mr. Boyle, but acceded to Mr. Petrie’s demand that he be terminated effective immediately. Mr Petrie retook the titles of chief executive officer and president. A press release announced these changes and stated that "The reason for the change was due to policy differences on the way the business should be run.”
Boyle had served but two months of his five-year contract. Claiming that the contract had been improperly breached by Petrie Stores Corporation, he brought this action seeking recovery of over $2,000,000 as liquidated damages he is entitled to under the contract. Defendant’s answer denies that it was responsible for the breach, and counterclaims for personal expenses incurred by Mr. Boyle and improperly charged to the corporation.
DISCHARGE — JUSTIFIED OR IMPROPER
This case presents the picture of a relationship which was probably doomed from the very beginning. The hiring of plaintiff created an inevitable confrontation between the grand old man who had built a business empire virtually single-handedly, who was somewhat tyrannical and whose employees regarded him with a mixture of awe, fear, respect and affection, and a brash young executive determined to assert his authority and shoulder aside the old man at the earliest opportunity. The younger was hot tempered and equally tyrannical, but in addition, for a newcomer, he demonstrated remarkable abrasiveness and lack of tact. The question in this case, however, is not whether he was excessively aggressive, rude, pushy and impolitic, but whether, having aroused the ire of the man who felt that he was still running the show, he was discharged for cause.
*386 There is no question that Mr. Petrie, and the board of directors which he dominated, had the right to discharge Mr. Boyle. The question presented to the court is whether the discharge was "for cause” and what are the consequences of that discharge under the employment agreement. The 19-page agreement, which was carefully worked out by experienced and sophisticated counsel on both sides, deals at some length with termination of employment. If terminated for permanent physical or mental disability, plaintiff was to be paid $250,000 per year to September 30, 1992. As to any other termination of employment, the contract recognized that it would be ended either by:
(a) voluntary resignation;
(b) termination for material breach or just cause; or
(c) other termination.
"Material breach” and "just cause” are defined as:
(1) willful misconduct in following the legitimate directions of the board of directors;
(2) conviction of a felony;
(3) habitual drunkenness;
(4) excessive absenteeism;
(5) dishonesty; and
(6) continuous conflicts of interests after notice in writing from the board of directors.
Notably, a discharge for insubordination, rudeness, demoralization of employees, personality clashes or differences in personal style, outlook or policy does not, under the contract, constitute a discharge for just cause, but falls into the category of termination for other reasons. This makes a substantial difference in the employee’s rights, since if the termination is not for just cause, the agreement spells out the rights of the employee as to stock shares and money payments.
WILLFUL MISCONDUCT
The "willful misconduct” specified in the agreement as a just cause for termination is failure to follow the legitimate directions of the board of directors. There is no indication that the Petrie board of directors ever gave any directions to Mr. Boyle which he failed to carry out. While Mr. Petrie dominated the board, and could have it carry out his wishes, he had never caused it to issue any directives for Boyle to follow. Petrie controlled the board and was chairman of the board, but he was not the board. (Business Corporation Law § 708 [a]; *387 Matter of Shupack, 1 NY2d 482.) That group of ladies and gentlemen, mindful as they may have been of Mr. Petrie’s position and his ownership of 63% of the shares, was still a separate and independent legal entity. Mr. Petrie’s wishes still to be treated as "the boss” cannot be equated with the board’s directions. The board, as a composite corporate body, speaks through its resolutions and bylaws. (3 White, New York Corporations j| 708.2; 15 NY Jur 2d, Business Relationships, § 885.)
The bylaws in this case, no matter what the feelings and understandings of Mr. Petrie, defined the respective powers and duties of Mr. Petrie as chairman of the board and Mr. Boyle as president and chief executive officer. Bylaw 4.6 had been amended by the board of directors to redefine the responsibilities of Mr. Petrie as chairman of the board. Under the amended bylaws, he was no longer to function as the chief executive officer, but his defined function was to preside at the board of directors and shareholders’ meetings, with such other powers and duties as would be assigned to him by the board. Boyle, as chief executive officer, was given general supervision by the bylaws over the business of the corporation. Significantly, the prior provision that the president was to be subject to the control of the board and the chairman of the board was revised by the amendment of September 17, 1982 to make the president subject to the control of the board only, and not to the chairman of the board. Despite self-serving statements, a direction by Mr. Petrie was not legally "tantamount to a direction by the Board.” Given this state of facts, it is understandable that Boyle believed that the lines of authority were clear, that he was not subordinate to Mr. Petrie, and that Petrie no longer had operational authority. His flatly assertive statements of supreme authority disturbed and puzzled the employees accustomed to years of Petrie’s domination. The court concludes that Mr. Boyle, however much he may have incurred the wrath of Mr. Petrie or how discourteous he may have been, was never guilty of "willful misconduct in following the legitimate directions of the Board of Directors” as defined in the contract. He had insulted the chairman and principal stockholder and made it impossible for them to work together, but he had not flouted any express instructions of the board.
DISHONESTY
That leaves as the remaining possible basis for discharge *388 for cause under the contract the contention that Boyles was guilty of "dishonesty”. The claims of "dishonesty” were not a basis of the discharge of Boyle by Mr. Petrie or the board of directors at the time, but were first asserted by defendant’s lawyers during the course of this case. But even if dishonesty had not been asserted as a ground for termination at the time of the firing, if facts then existed which would justify termination for cause and were later discovered, plaintiff could be denied the specified termination benefits provided for in the contract. (See, Graves v Kaltenbach & Stevens, 205 App Div 110, 111, affd 237 NY 546; Getty v Williams Silver Co., 221 NY 34, 39; Procter v Mount Vernon Arena, 265 App Div 701, 702; Hadden v Consolidated Edison Co., 45 NY2d 466, 470.)
THE LAW ON DISHONESTY
While dishonesty is a generally understood term, and some flagrant conduct is clearly over the line, once we get beyond obvious theft, embezzlement, and fraud, there is little case law to guide us in determining whether employee omissions, mistakes and irregularities constitute such employee dishonesty as to warrant discharge.
Judge Cardozo elucidated the problem of defining dishonest in World Exch. Bank v Commercial Cas. Ins. Co., (255 NY 1, 5), when he stated: "Dishonesty, unlike embezzlement or larceny, is not a term of art. Even so, the measure of its meaning is not a standard of perfection, but an infirmity of purpose so opprobrious or furtive as to be fairly characterized as dishonest in the common speech of men. 'Our guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract’ (Bird v. St. Paul F. & M. Ins. Co., 224 N. Y. 47, 51; Silverstein v. Metropolitan Life Ins. Co., 254 N. Y. 81, 84).” (Emphasis added.)
An employee who uses company funds believing it to be justified, and who stands ready to return the funds, may do so without wrongful intent and be found free of dishonesty, though guilty of irregularities. "The rule in this and other jurisdictions is that misconduct constituting fraud and dishonesty must amount to more than casual acts consisting of irregularities, mistakes and omissions of duty. There must be acts * * * that involve bad faith, willfulness, a breach of honesty, a want of integrity, or moral turpitude affecting the official fidelity or moral character of the employee”. (Schreiber Travel Bur. v Standard Sur. & Cas. Co., 240 App Div 279, 282.) Dishonesty can be established only when it has been *389 proven that the employee acted with an intent to wrongfully deprive his employer of its property. Secrecy and concealment are the hallmarks of dishonesty. (Jamestown Bridge Commn. v American Employers’ Ins. Co., 85 RI 146, 128 A2d 550 [1957].) Applying these criteria to the facts in this case lead the court to conclude that there was no such dishonesty on the part of Boyle which would justify a forfeiture of his contractual benefits.
CHARGING OF PERSONAL EXPENSES
There are few cases dealing with the alleged mishandling of expense accounts, especially by chief executives, as a basis for termination of a contract of employment. A very early case arose in 1903, in Hutchinson v Washburn (80 App Div 367), where it was held that an employee’s charging an employer more for a hotel bill than he actually paid was a dishonest padding of his expense account justifying his firing. The question is always whether a wrongful intent has been present. Thus, the use of company funds surreptitiously to pay gambling debts or sustain a mistress clearly justifies termination without employee recourse. (Sim v Beauregard Elec. Coop., 322 So 2d 410 [La Ct App 1975].) In Heyman v Kline (344 F Supp 1088, revd on other grounds 456 F2d 123, cert denied 409 US 847), an employee who submitted fraudulent expense vouchers, took kickbacks and was disloyal was held to have been guilty of such intentional misconduct as to warrant termination for cause. But, where an unauthorized use of company funds is not concealed, and is merely unjustified, termination is not warranted. (Mansfield v Lang, 293 Mass 386, 200 NE 110 [1936].) Under these standards, I find no evidence of willful dishonesty or concealment in this case.
Insofar as Boyle’s personal expenses which were charged to the corporate account are concerned, they were open and notorious, and were bunched in a short period of time. Boyle claims because of his sudden ejection from his position, there was no opportunity for him to make personal reimbursement for these items which were clearly personal, and that others he regarded as the normal perquisites of his position. While the procedures for charging such items seems to have been rather loose, and possibly a subject for internal discussion and the fixing of policy, it does not appear that Boyle was surreptitiously trying to disguise his personal expenses as corporate items, and even if some of the items were reimbursable, it does not appear that any dishonesty was involved. If so, then *390 a significant proportion of America’s corporate executives would be subject to a charge of "dishonesty” in attempting to stretch the corporate expenses account to cover some of their personal expenditures, and the shock waves would reverberate around the country.
There was no blatant attempt at padding or concealment by Mr. Boyle, there was no submission of nonexistent items, there was no misrepresentation or concealment, and the charges of dishonesty are rejected as an afterthought by the defendant, without essential substance.
Thus, the court concludes that defendant has failed to establish that Boyle was terminated for dishonesty or any of the grounds specified in the employment agreement as "material breach or just cause”.
DAMAGES UNDER THE CONTRACT
The employment agreement is quite specific about the damages which are to be payable for termination other than for "material breach or just cause”. Section 7 (a) of the agreement provides that in the event of a termination other than for "material breach or just cause”, the corporation is to pay "in one lump sum the amounts otherwise payable to Employee * * * discounted to present value at the rate of 15 percent per annum.” Calculation of the lump sum payable thus works out to $1,439,352.44 in lieu of lost salary, and $166,689.39 in guaranteed bonus claims, for a total of $1,606,041.83.
While this is a very substantial figure to pay a man who was on the job for eight weeks, and was fired within days after his orientation period, when he tried to take over the reins of management, we are dealing here with a provision for liquidated damages designed to provide some precision for the calculation of otherwise speculative damages.
LIQUIDATED DAMAGES
Parties may properly agree to a dollar figure representing the injuries they agree the plaintiff would sustain if the contract were breached. (Truck Rent-A-Center v Puritan Farms 2nd, 41 NY2d 420, 424-425.) So long as the liquidated damages provisions are neither unconscionable nor contrary to public policy, they will be enforced as written by a court. (Mosler Safe Co. v Maiden Lane Safe Deposit Co., 199 NY 479, 485; Marvel v Lilli Ann Corp., 28 Misc 2d 979, affd 15 AD2d 565, affd 11 NY2d 938.)
*391 Defendant contends that the contractual provisions for liquidated damages are, in fact, a penalty. Stipulated contractual damages will be considered a penalty only if the amount provided for is clearly disproportionate to the actual loss, and as an in terrorem effort to assure performance regardless of economic loss. Those cases urged by the defendant as standing for the proposition that stipulated damages such as those here involved should be considered a "penalty” are readily distinguishable. Since courts have traditionally, from the time of the Merchant of Venice, viewed a forfeiture out of all proportion to the breach of contract as an unenforceable penalty, our courts have attempted to strike out the clear penalties while upholding agreements which clarified amounts of damage which could otherwise be in dispute. "Generally whenever the damages flowing from a breach of a contract can be easily established or where the damages fixed are plainly disproportionate to the injury the stipulated sum will be treated as a penalty. So where a strict construction would result in absurdity [t]here must be some attempt to proportion these damages to the actual loss.” (Seidlitz v Auerbach, 230 NY 167, 173-174; see, e.g., Manhattan Syndicate v Ryan, 14 AD2d 323; Gilad Realty Corp. v Ripley Pitkin Ave., 48 AD2d 683; City of New York v Brooklyn & Manhattan Ferry Co., 238 NY 52; Lenco, Inc. v Hirschfeld, 247 NY 44.) In this case, a termination of Boyle’s employment contract could result in damages well over $500,000 a year, and the parties could reasonably agree that instead of litigating the question of damages after the event, which would leave uncertainties such as the employee’s efforts to mitigate damages by securing other employment, and the question as to how long the other employment might last, and whether the benefits were comparable, they could reasonably agree beforehand as to what damages would be payable. The amounts fixed do not exceed the total compensa-, tion provided in the five-year contract.
Both parties to the contract were sophisticated and were represented by able counsel. This is a factor to be taken into consideration in determining whether one side is now exacting an unconscionable penalty. (Key Intl. Mfg. v Stillman, 103 AD2d 475; Ryan v Orris, 95 AD2d 879.)
It is to be recalled that Boyle was aware of Mr. Petrie’s mercurial reputation, and wanted some concrete assurances of security before giving up the well-paid position he had worked himself up to with Federated Stores. An involuntary discharge from Petrie Stores would cast a considerable shadow on Mr. *392 Boyle’s reputation as a young super-achieving executive, and possibly diminish his prospects for the future. The agreement was carefully negotiated at arm’s length by reputable attorneys for both parties, and it was clearly understood that a precipitate firing of Mr. Boyle could result in very substantial contractual damages. The fact that the parties agreed to limit liability to $2,100,000 excluding stock options demonstrates a realization that without such a ceiling the actual damages could go even higher.
A case which bears some remarkable similarities to the facts in issue here is Zeppenfeld v Morgan (185 SW2d 898 [St. Louis, Mo, Ct App 1945]). In that case, plaintiff was to be hired as the general manager and to obtain an interest in the business, leaving a secure job which he had held for many years. Both parties were represented by counsel in negotiating an employment contract. When plaintiff arrived on the scene, he was not permitted to function as general manager and many of his instructions were countermanded by the defendant. Within a short time, defendant told plaintiff that the employment agreement was a terrible mistake. The court held that plaintiff was entitled to take over his duties as provided in the contract, that a proposal to pay him the same amount for duties of lesser scope was not in accord with the contract, and therefore the court agreed to award the employee the liquidated damages provided in the contract for breach. The court found the provision for the stipulated damages was reasonable to compensate plaintiff who would have to rehabilitate himself for another position and who lost option rights for an ownership share of the business.
The lump-sum payment provision here clearly was a liquidated damages provision and not a penalty. In the bargaining neither party had the ability to overreach the other. The sum provided for was not disproportionate to the damages which could be incurred. Plaintiff’s counsel, Shearman & Sterling, took no undue advantage of defendant’s special counsel, Sullivan & Cromwell, and its corporate counsel, Skadden, Arps, Slate, Meagher & Flora, as well as its inhouse lawyers. The damage provisions are valid and enforceable pursuant to their terms.
MITIGATION
The fact that subsequent to his termination Boyle took a position with another corporation — General Mills — as 1 of 6 *393 executive vice-presidents, rather than as chief executive officer, does not serve to mitigate the liquidated damages.
Once the parties have provided for valid liquidated damages, the sum payable becomes fixed and there is no further inquiry to be made as to possible mitigation by subsequent employment. (Musman v Modern Deb, 50 AD2d 761; to the same effect, see, Wassenaar v Panos, 111 Wis 2d 518, 331 NW2d 357.) In Musman (supra), the plaintiff sued for wrongful termination of a five-year employment contract which provided that if he was terminated without cause, he was to receive full compensation and bonuses to the end of the five-year term. When the trial court reduced the amount of liquidated damages so specified by the amount plaintiff earned from other employment, the Appellate Division, First Department, held this to be improper, and restored the full amount of liquidated damages without deduction. It held that the agreement fixing the damages was in essence a liquidated damages clause, fixing the employer’s exposure following a discharge without cause and removing the case from the ordinary rule requiring the employee to mitigate damages, citing Cornell v T.V. Dev. Corp. (17 NY2d 69, 74). The cases urged by defendant in support of the proposition that there should be mitigation, such as Rudman v Cowles Communications (30 NY2d 1) and McCelland v Climax Hosiery Mills (252 NY 347), dealt with the obligation of a discharged employee to mitigate damages in the absence of any provision for liquidated damages.
Here, a formula was set forth to calculate damages without regard to subsequent extrinsic facts. At the time the parties could not know how long plaintiff would be unemployed if terminated. We still do not know how long the subsequent employment will continue, or whether it will give the same net to Mr. Boyle as his Petrie Stores contract over a five-year span, since his subsequent General Mills contract is terminable at will. We need not wait to the conclusion of the five-year contract period to find out what Boyle’s aggregate loss of earnings might be, because the agreement requires the liquidated damages to be paid "forthwith”. That clearly contemplates that damages were to be fixed as of the date of termination, regardless of events thereafter.
In addition to the lump-sum payment provided for, Mr. Boyle is also entitled to exercise the stock option as provided in section 5 (b) of the agreement. The grant of such an option *394 had been agreed by the board of directors on November 1, 1982. In addition, he is entitled under the agreement to 50,000 unrestricted shares of stock in Petrie Stores, which was the agreed upon inducement for Boyle making the changeover and becoming an officer and director of Petrie. At the time of the trial the price per share was $34, so the 50,000 shares had a value of $1,700,000. Had Boyle received the shares as provided for, he would also have received the dividends on those shares, which appears to be in excess of $210,000 plus interest.
In addition, the agreement provided that Mr. Boyle was to be given paid-up term life insurance policy for five years as of the commencement of his employment, payable to a beneficiary designated by him, which he was never given. He was also entitled to get his unreimbursed moving expenses and living expenses incurred to January 12, 1983.
A further provision of the contract, section 6 (i), specified that Boyle was to be paid on January 15, 1983 "an amount not to exceed $100,000 in respect of forfeited interests relating to profit-sharing, stock options, bonus and other items that [he] most likely would have received from his previous employer.” The evidence is that Boyle would have received such benefits in excess of $100,000 which he forfeited by leaving Federated for Petrie. He is entitled to that sum.
Accordingly, pursuant to the findings and conclusions above, the court dismisses the affirmative defenses and counterclaims except for the direction of repayment of personal expenses and loan interest, and directs judgment for the plaintiff awarding damages of $1,606,041 with interest from January 13, 1983, unpaid dividends of $100,000 with appropriate interest, $5,488 for expenses, a term life insurance policy of $1,000,000 to October 1, 1987 and an award of 50,000 shares of unrestricted stock, and stock options.* Defendant is entitled *395 to judgment on its counterclaims for unreimbursed personal expenses and interest on the promissory note of $262,500.

 Upon a subsequent motion by defendant to modify the decision, and award the cash value of the shares and options, rather than the shares themselves, the court took further testimony. Since the stock had increased in value subsequent to the date of the discharge, plaintiff continued to urge that he be given the stock options rather than their cash value. The court held that despite the conflicting testimony as to the value of the stock options, "the essence of a grant of specific performance is the uniqueness of the item which is being dealt with, not the difficulty of putting value on it”. The court thereupon found the stock (restricted shares) at the time of *395 discharge worth $1,225,000, and after reviewing the recondite formulae for the valuation of a 10-year stock option for 250,000 shares, fixed the option value at $1,156,000. Apart from the paid-up insurance policy, plaintiff entered judgment for $5,283,383.97.