**DAR & ASSOCIATES, INC., et al., Plaintiffs,**

v.

**UNIFORCE SERVICES, INC., Defendant.**

No. 98–CV–409(JG).

United States District Court, E.D. New York.

Jan. 13, 1999.

**194**

Jeffrey L. Forman, Kauffman and Forman, P.A., Towson, MD, for plaintiffs.

Joel A. Klarrreich, Newman Tannenbaum Helpern, Syracuse & Hirschtritt, LLP, New York City, for defendant.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

Plaintiffs DAR & Associates, Inc. ("DAR"), its two principals, Wilson S. Davis and Sheryl Davis–Kohl, and D.A.R. Temps, Inc., initiated this action against Uniforce Services, Inc. ("Uniforce"), for breach of contract and for a declaratory judgment that the restrictive covenants and a liquidated damages provision in certain contracts between these parties are unenforceable under New York law. Before me now are cross-motions for partial summary judgment with respect to the declaratory judgment issues. In addition, DAR seeks a return of the amounts paid to Uniforce under their agreement since the date the complaint was filed.

### FACTS

Uniforce, a New York corporation, owns and licenses supplemental staffing service offices, which provide temporary employees to businesses and government agencies. As of September 1, 1998, Uniforce owned ten and licensed twenty-six of these offices in nineteen states, furnishing services in twenty-four states and the District of Columbia. In February 1988, Uniforce purchased the assets of Employers Overload, a Minnesota corporation that operated and franchised supplemental staffing service offices. Among the purchased assets was an existing franchise agreement between Employers Overload and DAR, a Maryland corporation, for the operation of a temporary employment agency in certain areas of Maryland.

On November 14, 1988, Uniforce and DAR entered into a licensing agreement (the "License Agreement"). Under this contract, Uniforce permitted DAR to operate a supplemental staffing service office in Maryland under the trade name "Uniforce" and provided DAR with a comprehensive operations plan called the "Uniforce System." This plan included information about management, training, marketing, and the general operations of a temporary services office. Uniforce also agreed in the contract to perform all payroll functions, including withholding and processing of taxes and acquiring workers' compensation and employer's liability insurance. Under the agreement, DAR and Uniforce divide the "gross profit," which is the balance remaining after these expenditures. Since January 1, 1991, the profit split has been 55% to DAR and 45% to Uniforce.

Uniforce contends that, through its operating manual, training tapes, training sessions, and consultations, it imparted to DAR confidential information pertaining to developing and selling Uniforce product lines; training managers; techniques on how to recruit, retain, reactivate, and acquire referrals; sales presentations to prospective clients; billing rates; advertising; and cross-selling techniques. Uniforce also provided DAR with accounts receivable processing, credit and collection advice, and a liaison between the two companies. Uniforce has loaned DAR over $285,000 during the term of the companies' affiliation, and has advanced DAR $100,000 on collected receivables.

Article XV of The License Agreement, entitled "Covenants Not To Compete," includes a covenant not to compete, a nonsol-

icitation provision, and a liquidated damages clause. Article XV(C) sets forth the noncompetition clause:

> Upon termination of this Agreement, [DAR and its principals] agree that for a period of one (1) year commencing on the effective date of termination or the date on which [DAR] ceases to operate a Uniforce temporary personnel service within the Territory, whichever is later, neither [DAR nor its principals] will have any direct or indirect interest ... in: (1) any business offering temporary personnel services operating within a radius of fifty (50) miles of DAR's former place of business or (2) any entity which is granting franchises or licenses for businesses offering temporary personnel services.

Article XV(D) is the nonsolicitation clause:

> Upon termination of this Agreement, [DAR and its principals] agree that for a period of two (2) years, commencing on the effective date of termination, or the date upon which [DAR] ceases to operate a Uniforce temporary personnel service within the Territory, whichever is later, neither [DAR nor its principals] directly or indirectly ... will (1) solicit or accept any temporary personnel service business from any client of the Uniforce business formerly operated by [DAR] or (2) solicit for employment or employ any person employed by Uniforce and placed by [DAR] within (a) a period of one year prior to the effective date of termination or (b) the date upon which [DAR] ceases to operate a Uniforce temporary personnel service business, whichever is later.

In the event DAR or its principals breach either of these restrictive covenants, Article XV(F) provides for liquidated damages:

> [DAR] acknowledges that in the event [DAR] does not comply with the restrictions of either Article XV(C) or Article XV(D), the damages sustained by [Uniforce] due to [DAR's] or its owner's business activity in violation of these restrictions, and the reasonable value of the knowledge, confidential information, methods and trade secrets comprising the UNIFORCE SYSTEM shall be difficult to ascertain; and, therefore, [DAR] or its owners who engage in business activity violating these covenants shall pay [Uniforce] as liquidated damages, and not as a penalty, a sum equal to twelve (12) times the highest monthly service charge earned by [Uniforce] hereunder as described in Article X(C)(2) of this Agreement during the twelve (12) months preceding the earlier of: (1) the date of notice of termination of this Agreement; or (2) the date on which [DAR] ceases to operate a UNIFORCE temporary personnel service business.

In 1994, the parties agreed to transfer to DAR the role of employer-of-record of the temporary employees placed by DAR, and DAR created D.A.R. Temps, Inc. ("D.A.R.Temps"), a Maryland corporation, for that purpose. On May 31, 1994, Uniforce, DAR, and D.A.R. Temps entered into an agreement (the "1994 Agreement") that assigned to D.A.R. Temps that responsibility and the additional responsibility of obtaining workers' compensation insurance. Uniforce, however, remained obligated to fund the payroll and take care of tax withholding and reporting for those employees.

Paragraph seven of the 1994 Agreement is a covenant not to compete. Pursuant to that provision, D.A.R. Temps, which was not a party to the License Agreement, acknowledged the proprietary nature of, *inter alia*, Uniforce's client and temporary employee lists, and agreed neither to engage in the temporary personnel service business (other than with Uniforce) nor to disclose such proprietary information for a one-year period after the termination of the agreement. This covenant relates only to D.A.R. Temps; DAR continued to be bound by the covenants in the 1988 License Agreement.

On August 8, 1997, plaintiffs filed a complaint in the District of Maryland, asserting a breach of contract claim against Uniforce and seeking a declaration that the covenant not to compete, the non-solicitation provision, and the liquidated damages provisions in the License Agreement are unenforceable, as is the covenant not to compete in the 1994 Agreement. The Honorable Benson Everett Legg, by order dated December 22, 1997, transferred the case to this district.

## DISCUSSION

### A. *The Standard for Summary Judgment*

Courts must grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether material facts are in dispute, courts must resolve all ambiguities and draw all inferences in favor of the non-moving party. *See Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir.1998).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). The nonmoving party cannot survive a properly supported motion for summary judgment

by resting on its pleadings "without offering 'any significant probative evidence tending to support the complaint.' " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

Here, as reflected by both sides having moved for summary judgment, the parties agree that there are no disputed issues of fact. Specifically, plaintiffs do not dispute the assertions set forth in the affidavit of John Fanning dated September 8, 1998 ("Fanning Aff."). Rather, they assert that the restrictive covenants are unenforceable under New York law and that, if they are enforceable, the liquidated damages clause is void as a penalty under New York law.

### B. *The Restrictive Covenants*

■ Under New York law,[1] the enforceability of a restrictive covenant depends in part upon the nature of the underlying contract. In *Purchasing Assocs. v. Weitz*, 13 N.Y.2d 267, 246 N.Y.S.2d 600, 196 N.E.2d 245 (1963), the New York Court of Appeals observed that in earlier years courts did not enforce restrictive covenants, viewing such provisions as restraints of trade. More recently, however, courts have held that in some situations it is both desirable and essential to enforce restrictive covenants. Such a covenant is enforceable, for example, in a contract for the sale of a business involving the transfer of good will as a going concern. *See id.* at 271, 246 N.Y.S.2d 600, 196 N.E.2d 245. Enforceability in that instance rests on the premise that "a buyer of a business should be permitted to restrict his seller's freedom of trade so as to prevent the latter from recapturing and utilizing, by competition, the good will of the very business which he transferred for value." *Id.*

---

**1.** According to Article XX(D) of the License Agreement, New York law governs any dispute between the parties.

■ The Court of Appeals in *Weitz* identified employment contracts as a second context in which restrictive covenants may generally be enforceable. Courts will enforce a provision in an employment contract restricting the future commercial conduct of the employee if the restriction is reasonable in duration and geographic scope and if it is necessary to prevent the employee's use or disclosure of the former employer's trade secrets, or "his solicitation of, or disclosure of any information concerning, the other's customers." *Id.* at 272, 246 N.Y.S.2d 600, 196 N.E.2d 245; *see also Columbia Ribbon & Carbon Mfg. Co., Inc. v. A–1–A Corp.*, 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 369 N.E.2d 4 (1977).

Non-competition covenants usually arise in one or the other of these two contexts. *See Baker's Aid v. Hussmann Foodservice Co.*, 730 F.Supp. 1209, 1213 (E.D.N.Y. 1990). Reasonable restrictive covenants ancillary to the sale of a business "are routinely enforced" to protect the goodwill paid for by the purchaser. *Id.* at 1214 (citing *Chevron U.S.A., Inc. v. Roxen Serv. Inc.*, 813 F.2d 26, 28 (2d Cir.1987)). On the other hand, courts treat restrictive covenants in employment agreements differently. "Because enforcement of employee restrictive covenants may result in the loss of an individual's livelihood, such covenants are 'rigorously examined' and enforced only to protect an employer from unfair competition stemming from—among other things—the disclosure of trade secrets." *Id.* (citing *American Inst. of Chem. Eng'rs v. Reber–Friel Co.*, 682 F.2d 382, 387 (2d Cir.1982)). As the Court of Appeals noted in *American Broadcasting Cos. v. Wolf*, 52 N.Y.2d 394, 404, 438 N.Y.S.2d 482, 420 N.E.2d 363 (1981), "once the term of an employment agreement has expired, the general public policy favoring robust and uninhibited competition should not give way merely because a particular employer wishes to insulate himself from competition."

Uniforce appears to view the case at bar as analogous to the line of cases involving the sale of a business, while DAR argues for application of the more stringent standards of enforceability associated with employment contracts. This case, however, does not fit comfortably into either category. DAR cannot accurately be characterized as a seller to Uniforce of a business involving the transfer of good will as a going concern for immediate consideration. On the other hand, the License Agreement is not an employment contract, and DAR was not Uniforce's employee. Rather, DAR was an experienced temporary services agency before it entered its agreement with Uniforce in 1988. DAR obviously wished to take advantage of benefits that the Uniforce system offered and therefore entered into a commercial contract that included the restrictive covenants now at issue.

■ Consequently, this case falls within a third category of cases dealing with restrictive covenants—those involving covenants made as part of ordinary commercial contracts, such as license agreements. Courts analyze these types of covenants under a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract. *See Baker's Aid*, 730 F.Supp. at 1214; *Winston Franchise Corp. v. Williams*, No. 91–CV–7963, 1992 WL 7843, at *6 (S.D.N.Y. Jan.10, 1992). In applying this rule of reason to this case, I will first consider whether Uniforce has demonstrated a legitimate business interest that warrants the enforcement of the restrictive covenants. Then I will examine the reasonableness of the covenants with respect to geographic scope and temporal duration. Finally, I will analyze the degree of hardship that enforcing these covenants would inflict upon DAR, bearing in mind the degree to which DAR consciously agreed to bear the risk of such hardship when it entered into the contracts with Uniforce. *See American Inst. of Chem. Eng'rs v. Reber–Friel Co.*, 682 F.2d 382, 387 (2d Cir.1982) ("Only after determining that a restrictive covenant would serve to

protect against ... 'unfair and illegal conduct,' and not merely to insulate the employer from competition, does the reasonableness of the covenant in terms of its 'time, space or scope,' or the oppressiveness of its operation become an issue." (quoting *American Broadcasting Cos. v. Wolf,* 52 N.Y.2d at 403–04, 438 N.Y.S.2d 482, 420 N.E.2d 363)).

### 1. The *Interests Protected by the Restrictive Covenants*

Uniforce contends that, by becoming a Uniforce licensee and operating under the Uniforce name, DAR took advantage of the unique "Uniforce system," which consisted of confidential information pertaining to management, training, marketing, and the general operations of a supplemental staffing office. Fanning Aff. ¶ 7. In addition to its name and system, Uniforce established in Maryland a vast client base and temporary employee applicant pool during the nearly ten years that DAR has been a Uniforce licensee. If DAR is permitted to compete in its present territory directly against a new Uniforce franchise, DAR could use the know-how and proprietary information it acquired while operating under the Uniforce trade name, as well as the goodwill it developed as a Uniforce licensee, to divert business away from Uniforce. Uniforce thus claims that it has a legitimate business interest in protecting its know-how, client base, and applicant pool through the restrictive covenants. Enforcement of those covenants, Uniforce contends, is necessary to safeguard its goodwill as well as its ability to secure another franchise in Maryland, which Uniforce intends to do.

DAR does not contest Uniforce's assertion that its know-how, client base, and pool of temporary employees represent legitimate business interests that deserve protection through the restrictive covenants. Rather, DAR contends that Uniforce has no protectable business interest in this case because it (1) is not qualified to conduct business in Maryland and (2) is not registered to sell franchises in Maryland. DAR points out that Uniforce is qualified to do business only in New York, California, Florida, and Texas, and cannot sell franchises or offer licenses in Maryland without registering in that state.

DAR's argument is meritless. In order for Uniforce to have extended DAR a license in the first place, Uniforce received an exemption from filing from the Maryland Attorney General, thereby allowing it to license a business in the State of Maryland. *See* Fanning Aff., Ex. 6. If DAR were to terminate its agreement with Uniforce, it is undisputed that Uniforce could easily qualify to conduct business in Maryland or register in Maryland to offer the sale of licenses to other potential franchisees. Uniforce could comply with Maryland's Franchise Registration and Disclosure Law within approximately two months, allowing it to license another business. For this very reason, in Article XVI of the License Agreement, Uniforce and DAR agreed to a six-month notice requirement prior to the effective termination of the agreement. If DAR terminated the agreement, therefore, Uniforce would have six months to register in Maryland, enough time for it to comply with the necessary regulations and continue its presence in Maryland uninterrupted.

Protectable business interests may include prevention of unfair competition, "a malleable tort that includes any 'misappropriation for commercial advantage of a benefit or property right belonging to another.'" *Baker's Aid,* 730 F.Supp. at 1215 (quoting *Marcraft Recreation Corp. v. Frances Devlin Co.,* 459 F.Supp. 195, 199 (S.D.N.Y.1978)). For ten years, DAR benefitted from its relationship with Uniforce, attending Uniforce seminars and training sessions and obtaining information that enabled it to operate a temporary employment service. For DAR now to use what it has gained from Uniforce in order to compete against Uniforce would amount to unfair competition and would impede Uniforce's ability to secure another franchise

in the territory. *See Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 351 A.2d 207, 212 (1976); *Xerox Corp. v. Neises*, 31 A.D.2d 195, 295 N.Y.S.2d 717, 721 (1st Dep't 1968); *Rudiger v. Kenyon*, 32 Misc.2d 804, 224 N.Y.S.2d 545, 548 (1962).

This case is analogous to those in which courts have held that where an employment agency has amassed a list of job applicants whose names are not publicly ascertainable, a former employee may not appropriate those names in order to compete in the same business. *See Winston Franchise Corp. v. Williams*, No. 91–CV–7963, 1992 WL 7843, at *9 (S.D.N.Y. Jan.10, 1992). Courts have enforced restrictive covenants prohibiting such conduct, *see, e.g., Ecolab, Inc. v. Paolo*, 753 F.Supp. 1100 (E.D.N.Y.1991), and, even in the absence of a restrictive covenant, courts have issued injunctions to restrain the former employee's use of such non-public information, *see, e.g., Ability Search, Inc. v. Lawson*, 556 F.Supp. 9 (S.D.N.Y.1981), *aff'd*, 697 F.2d 287 (2d Cir. 1982). As the Second Circuit explained in *American Inst. of Chem. Eng'rs v. Reber–Friel Co.:*

> A court will prevent the solicitation by a former employee of customers who are not openly engaged in business in advertised locations or whose availability as patrons cannot readily be ascertained but whose trade and patronage have been secured by years of business effort and advertising, and the expenditure of time and money, constituting a part of the good will of a business which enterprise and foresight have built up.

682 F.2d 382, 387 (2d Cir.1982) (internal quotes omitted). Accordingly, I conclude that Uniforce possesses an interest in its know-how, client base, pool of temporary employees, and goodwill that warrants some protection through restrictive covenants.

### 2. The Reasonableness of the Restrictive Covenants

Under the License Agreement, for one year after termination, DAR cannot have any interest in any temporary personnel agency within fifty miles of DAR's former places of business in Maryland or in any entity granting franchises for temporary personnel agencies. In addition, for two years after termination, DAR may not solicit or accept any temporary personnel business from any of its former Uniforce clients, and may not solicit for hiring or hire any Uniforce employee whom it placed within one year prior to termination.

The reasonableness of these provisions is informed by the circumstances and context in which Uniforce seeks to enforce them. *See Gelder Med. Group v. Webber*, 41 N.Y.2d 680, 394 N.Y.S.2d 867, 871, 363 N.E.2d 573 (1977); *Reed, Roberts Assoc. v. Strauman*, 40 N.Y.2d 303, 386 N.Y.S.2d 677, 679–80, 353 N.E.2d 590 (1976). The noncompete and nonsolicitation clauses were specifically negotiated by sophisticated businessmen and businesswomen. In exchange for them, Uniforce made significant financial concessions to DAR, including a waiver of its licensing fee and a two-year reduction of its share of monthly gross profits. Considering the size of the State of Maryland and the ten years Uniforce has supported DAR in that state, I find the noncompete and nonsolicitation covenants reasonable in both geographic scope and duration. They are reasonably related to Uniforce's interest in protecting its goodwill, know-how, and other proprietary information, and to its wholly legitimate desire to install a viable Maryland franchise in place of DAR. *See Carvel Corp. v. Eisenberg*, 692 F.Supp. 182, 186 (S.D.N.Y.1988).

### 3. The Degree of Hardship to Plaintiffs

In the event DAR terminates its agreement with Uniforce, enforcement of these restrictive covenants would prevent DAR, its principals, and D.A.R. Temps from operating a temporary services agency within Maryland during the year following termination. This hardship is admittedly similar to that suffered in the employment

cases by former employees whose livelihood becomes significantly curtailed by restrictive covenants. DAR, however, is a corporate entity. At the time the License Agreement and the 1994 Agreement were executed, DAR was owned and operated by the individual plaintiffs—professionals experienced in the business—who had the advice of counsel. There exists no evidence, and DAR does not allege, that it was coerced into entering either transaction or that it lacked any meaningful choice when its representatives signed the contracts or that the restrictive covenants were anything other than negotiated provisions in exchange for which DAR received valuable consideration.

In short, the hardship DAR faces if it terminates these agreements is mitigated by the fact that DAR and its principals, with their eyes wide open, specifically agreed to bear the risk of that hardship and was paid fairly to do so. DAR received the benefit of that bargain by its use of the Uniforce trade name and its use of Uniforce's proprietary information over the past ten years. It cannot now deprive Uniforce of a central benefit of its bargain by using what it gained from Uniforce to compete directly against Uniforce in the same market.

\*    \*    \*    \*    \*    \*

■ After applying to this case the rule of reason that balances the competing public policies in favor of robust competition and freedom to contract, I find that (1) Uniforce has demonstrated a legitimate business interest that justifies the enforcement of the restrictive covenants; (2) the covenants are reasonable with respect to geographic scope and temporal duration; and (3) the hardship that enforcing these covenants would inflict upon DAR is ameliorated by DAR's informed acceptance of such an outcome when it entered its agreements with Uniforce. The noncompete and nonsolicitation provisions in the License Agreement and 1994 Agreement are therefore enforceable.

### C. The Liquidated Damages Clause

■ Under New York law, parties have the right to specify in a contract the damages to be paid in the event of a breach, so long as the damages clause is neither unconscionable nor contrary to public policy. *See Rattigan v. Commodore Int'l Ltd.*, 739 F.Supp. 167, 169 (S.D.N.Y.1990) (citing *Truck Rent–A–Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424, 393 N.Y.S.2d 365, 361 N.E.2d 1015 (1977)). If the clause "is intended by the parties to operate in lieu of performance, it will be deemed a liquidated damages clause and may be enforced by the courts. . . . If such a clause is intended to operate as a means to compel performance, it will be deemed a penalty and will not be enforced." *Brecher v. Laikin*, 430 F.Supp. 103, 106 (S.D.N.Y.1977).

■ While freedom to contract lies at the core of contract law, "freedom of contract does not embrace the freedom to punish, even by contract." *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 360, 386 N.Y.S.2d 831, 353 N.E.2d 793 (1976). A clause setting damages much higher than the estimated actual loss does not provide fair compensation, but secures "performance by the compulsion of the very disproportion." *Truck Rent–A–Center*, 41 N.Y.2d at 424, 393 N.Y.S.2d 365, 361 N.E.2d 1015. Thus, parties may agree upon damages in advance when the liquidated amount "is a reasonable measure of the anticipated probable harm," and the probable actual loss from a breach is difficult to ascertain at the time the parties execute the contract. *Id.* at 425, 393 N.Y.S.2d 365, 361 N.E.2d 1015; *see also Vernitron Corp. v. CF 48 Assocs.*, 104 A.D.2d 409, 478 N.Y.S.2d 933, 934 (2d Dep't 1984). Both the reasonableness of the liquidated damages and the certainty of actual damages should be measured as of the time the parties entered the contract, not as of the time of the breach. *See Vernitron*, 478 N.Y.S.2d at 934.

■ Whether a provision constitutes an enforceable liquidated damages clause or an unenforceable penalty is a matter of law to be decided by the court. *See id.* Courts have tended in close cases to "favor the construction which makes the sum payable for breach of contract a penalty rather than liquidated damages, even where the parties have styled it liquidated damages rather than a penalty." *Rattigan v. Commodore Int'l Ltd.,* 739 F.Supp. 167, 169–70 (S.D.N.Y.1990) (quoting *City of New York v. Brooklyn & Manhattan Ferry Co.,* 238 N.Y. 52, 56, 143 N.E. 788 (1924)). Nevertheless, DAR has the burden of proving that the liquidated damage clause to which it freely contracted is, in fact, a penalty. *See id.* at 170; *P.J. Carlin Constr. Co. v. City of New York,* 59 A.D.2d 847, 399 N.Y.S.2d 13, 14 (1st Dep't 1977).

■ DAR argues that the liquidated damages clause at issue calls for an amount disproportionate to the actual damages Uniforce will likely suffer in the event of breach. Article XV(F) of the License Agreement states that, if DAR breaches the restrictive covenants, it must pay Uniforce "twelve (12) times the highest monthly service charge earned by [Uniforce] ... during the twelve (12) months preceding the earlier of: (1) the date of notice of termination of this Agreement; or (2) the date on which [DAR] ceases to operate a Uniforce temporary personnel service business." Because this provision does not calculate damages depending on when the breach occurs, DAR asserts that it is unrelated to any actual damages Uniforce might incur. Moreover, because the formula for determining damages multiplies the highest, as opposed to the average, month's earnings by twelve, DAR claims that the provision is coercive and designed to force compliance. For these reasons, DAR maintains, the liquidated damages clause acts as a penalty. I disagree.

Contracting parties have an incentive to negotiate a liquidated damages clause whenever the costs of such a negotiation are less than the expected costs resulting from their reliance on the standard compensatory damages rule for breach of contract. *See* Charles J. Goetz & Robert E. Scott, *Liquidated Damages, Penalties and the Just Compensation Principle: Some Notes on an Enforcement Model and a Theory of Efficient Breach,* 77 Col.L.Rev. 554, 559 (1977). This incentive was present here with respect to a prospective breach by DAR of the noncompete and nonsolicitation clauses.

If DAR were to sever its relationship with Uniforce but breach those covenants, Uniforce would, for a brief period of time, have no presence in Maryland at all. It would face a complete temporary loss of the clients and temporary employees it has developed there (through DAR as its licensee) since 1988. Once Uniforce found and trained a new licensee, that entity would then face the difficult task of wresting clients and temporary employees back from DAR or developing new ones, all the while competing against a company with ten years' experience in implementing the same Uniforce system that the new licensee would be learning from scratch. In those circumstances, Uniforce would deserve compensatory damages, and the costs of establishing them would be enormous. Plaintiffs dispute neither of those propositions. Nor do they dispute the assertion by Uniforce's founder that it was precisely because of this difficulty in calculating actual damages, and the desire to avoid expensive litigation in the event of breach, that the parties agreed to the liquidated damages formula plaintiffs now challenge. *See* Fanning Aff. ¶ 25.

Rather, plaintiffs contend that the formula they agreed to "is so blatantly unrelated to any 'actual damages' which [Uniforce] might incur as to render it penal on its face." Plaintiffs' Mem. at 14. They do not offer an explanation of why, if this is true, they negotiated for the formula, although they technically do not need to, since contract law forbids attempts to secure performance through penalties "even

where the evidence shows a voluntary, fairly bargained exchange." Goetz & Scott, *supra*, at 555. In any event, as set forth below, their argument has no merit.

In arguing that the liquidated damages clause calls for a penalty, plaintiffs place great weight on the fact that it fixes damages at twelve times the highest—rather than the average—of the monthly service charges earned by Uniforce in the year preceding the notice of termination (or, if earlier, the date DAR ceases to operate as a Uniforce licensee). Implicit in their argument is a further assertion that if Uniforce suffers damages in the year following a breach of the restrictive covenants, it would be unfair (*i.e.*, it would constitute a penalty) if Uniforce received more than the equivalent of a year's worth of service charge, a result the challenged formula would likely produce.

This facet of plaintiffs' argument fails because it artificially confines the duration and nature of the injuries the damages clause was designed to remedy. Uniforce bargained for protection from competition for only one year, but the nonsolicitation clause has a two-year term. Thus, the damages for the type of breach as to which declaratory relief is sought would be incurred for at least two years.[2] An application of the liquidated damages formula to the past performance of plaintiffs reveals that hypothetical breaches would have resulted in damage awards that were consistently (and often substantially) less than the service charges actually earned by Uniforce during the two years following the hypothetical breach. See Fanning Aff., Ex. 7. In addition, Uniforce's actual damages would include the loss of goodwill and the costs of reestablishing a presence in Maryland. Thus, plaintiffs' assertion that the use of the highest monthly service charge in the year preceding termination

turns the damage formula into a penalty has no merit.

Moreover, that the formula is pegged to performance occurring in the year prior to termination is a virtue. If revenues are high in the year preceding the breach, then damages would similarly run high and would more likely reflect the course of the business over the next couple years. If revenues in the preceding year were low, then damages would be correspondingly low. See *Howard Johnson Int'l Inc. v. HBS Family, Inc.*, No. 96 CIV. 7687, 1998 WL 411334, at *7 (S.D.N.Y. July 22, 1998). In addition, this method of calculation sets no minimum damages award, another feature that inures to Uniforce's benefit in its effort to uphold the clause. *See id.*

Plaintiffs further contend that the damages clause is unenforceable because it fails to take into account when a breach occurs. For example, if a prohibited solicitation of a former customer occurs just before the end of the two-year period of the nonsolicitation clause, plaintiffs argue, Uniforce's actual damages will be minuscule, but the liquidated damages will be calculated as though the breach had occurred at the beginning of the two-year period.

This possible result does not make the clause a penalty. As plaintiffs concede, the validity of a liquidated damages clause must be assessed as of the time the contract is made. If a disparity between actual and liquidated damages has any relevance at all, it is only to the extent it sheds light on the reasonableness of the agreement viewed *ex ante*. *Frick Co. v. Rubel Corp.*, 62 F.2d 765, 767 (2d Cir.1933) (L.Hand, J.). For the reasons discussed earlier, the liquidated damages formula is reasonably related to the damages the par-

---

**2.** Plaintiffs suggest that, since the 1994 Agreement makes D.A.R. Temps the employer-of-record of the temporary employees placed by DAR, the nonsolicitation clause has no force to the extent it relates to former Uniforce employees. *See* Plaintiffs' Mem. at 7 n. 4; Reply Mem. at 6. That seems to me a dubious proposition. I need not address that argument now, however, because there is no question that, at the very least, DAR would be bound for two years not to solicit business from former clients.

ties contemplated at the time of contract. *Id.* at 767–68. That plaintiffs can conjure a hypothetical breach (an extremely unlikely one at that) that would produce minuscule actual damages does not undermine the validity of the clause. To hold otherwise would essentially require contracting parties to bear the negotiating costs of tailoring liquidated damages provisions to calibrate damages differently depending on the various factors that can affect actual losses. This would largely defeat the central purpose that such provisions serve.

*Hackenheimer v. Kurtzmann,* 198 A.D. 691, 192 N.Y.S. 181 (4th Dep't 1921), illustrates this principle. In that case, the court enforced a $50,000 liquidated damages clause against a defendant who breached a restrictive covenant within months of the expiration of its five-year term. *Id.* 192 N.Y.S. at 182. The actual damages were minimal, as the breach was not only late in the term, but the defendant was unsuccessful in the business that violated the covenant. However, the court stated that "the contract ought to be interpreted as of the time it was made" and that, given the amount the plaintiffs had paid at that time for the goodwill of the business, the $50,000 in liquidated damages for a deliberate, intentional breach did "not shock the moral sense." *Id.*

Plaintiffs incorrectly contend that *Vernitron Corp. v. CF 48 Assocs.,* 104 A.D.2d 409, 478 N.Y.S.2d 933 (2d Dep't 1984), silently overruled *Hackenheimer.* *Vernitron* dealt with a lease agreement that contained a liquidated damages clause calling for a sum equivalent to one year's rent for any breach—even the most minor—of the agreement. It appeared clear, *ex ante,* that the loss that might result from certain minor defaults under the lease, such as the two-day delay in payment of rent upon which plaintiff sued, would be patently disproportionate to the amount of liquidated damages. The court in *Vernitron* thus held the liquidated damages clause unenforceable. *Hackenheimer,* on the other hand, like the case at bar, involved a liquidated damages provision that applied to the breach of a central provision in the contract: a restrictive covenant placed in the contract to safeguard the goodwill of the business. Moreover, like the proposed breach here, it involved not "a slight infraction of the restrictive covenant," but a deliberate breach of essential purpose. 192 N.Y.S. at 183, 198 A.D. 691 (Kruse, J., concurring). In short, *Vernitron,* does not even conflict with *Hackenheimer,* let alone overrule it.

Finally, when analyzing the reasonableness of a liquidated damages provision, the court must consider "the sophistication of the parties and whether both sides were represented by able counsel who negotiated the contract at arms length without the ability to overreach the other side." *Howard Johnson,* 1998 WL 411334, at *6 (quoting *Wilmington Trust Co. v. Aerovias de Mexico,* 893 F.Supp. 215, 218 (S.D.N.Y. 1995)); *see also Pacificorp Capital, Inc. v. Tano, Inc.,* 877 F.Supp. 180, 184 (S.D.N.Y. 1995); *Boyle v. Petrie Stores Corp.,* 136 Misc.2d 380, 518 N.Y.S.2d 854, 861 (1987). There is no indication of any imbalance in bargaining power between DAR and Uniforce when they agreed to the liquidated damages provision. As discussed earlier, when DAR entered the agreements at issue, it was run by experienced professionals who had the advice of counsel.

For these reasons, I conclude both that actual damages were not readily ascertainable at the time the parties entered into these agreements and that the agreed upon method for calculating damages is reasonable. The liquidated damages clause is, therefore, enforceable.

### D. The Return of Gross Profits

DAR seeks a money judgment for all royalties paid to Uniforce during the pendency of this action. Because this argument is premised on the unsuccessful contention that key portions of the agreements are unenforceable, it is rejected.

## CONCLUSION

For the reasons stated above, plaintiffs' motion for partial summary judgment with respect to the declaratory judgment issues is denied. Defendant's cross-motion for partial summary judgment is granted.

So Ordered.